**Slip Op. 15-133**

## UNITED STATES COURT OF INTERNATIONAL TRADE

**FRESH GARLIC PRODUCERS ASSOCIATION, CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, VALLEY GARLIC, and VESSEY AND COMPANY, INC.,**

Plaintiffs,

**HEBEI GOLDEN BIRD TRADING CO. LTD., CHENGWU COUNTY YUANXIANG INDUSTRY & COMMERCE CO., LTD., QINGDAO XINTIANFENG FOODS CO., LTD., SHENZHEN BAINONG CO., LTD., YANTAI JINYAN TRADING, INC., JINING YIFA GARLIC PRODUCE CO., LTD., JINAN FARMLADY TRADING CO., LTD., WEIFANG HONGQIAO INTERNATIONAL LOGISTICS CO., LTD., and SHIJIAZHUANG GOODMAN TRADING CO., LTD.,**

Consolidated Plaintiffs,

v.

**UNITED STATES,**

Defendant,

**SHENZHEN XINBODA INDUSTRIAL CO., LTD., JINXIANG MERRY VEGETABLE CO., LTD., and CANGSHAN QINGSHUI VEGETABLE FOODS CO., LTD.,**

Defendant-Intervenors.

**Before: Jane A. Restani, Judge**

**Consol. Court No. 14-00180**

## OPINION

[Commerce's final results in antidumping duty administrative review sustained in part and remanded in part.]

Dated: November 30, 2015

Michael J. Coursey and John M. Herrmann, II, Kelley Drye & Warren, LLP, of Washington, DC, for plaintiffs.

Robert T. Hume, Hume & Associates, LLC, of Ojai, CA, for consolidated plaintiffs Hebei Golden Bird Trading Co., Ltd., Qingdao Xintianfeng Foods Co., Ltd., Shenzhen Bainong Co., Ltd., Yantai Jinyan Trading, Inc., Jining Yifa Garlic Produce Co., Ltd., Jinan Farmlady Trading Co., Ltd., Weifang Hongqiao International Logistics Co., Ltd., and Shijiazhuang Goodman Trading Co., Ltd.

Yingchao Xiao and Jianquan Wu, Lee & Xiao, of San Marino, CA, for consolidated plaintiff Chengwu County Yuanxiang Industry & Commerce Co., Ltd.

Richard P. Schroeder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief were Justin R. Becker, Senior Attorney, and Khalil N. Gharbieh, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan PLLC, of Washington, DC, for defendant-intervenor Shenzhen Xinboda Industrial Co., Ltd.

John J. Kenkel, deKieffer & Horgan PLLC, of Washington, DC, for defendant-intervenors Jianxiang Merry Vegetable Co., Ltd. and Cangshan Qingshui Vegetable Foods Co., Ltd.

Restani, Judge:  This action challenges the Department of Commerce's ("Commerce")

final results from the eighteenth administrative review of the antidumping ("AD") duty order on

fresh garlic from the People's Republic of China ("PRC").  Fresh Garlic from the People's

Republic of China:  Final Results and Partial Rescission of the 18th Antidumping Duty

Administrative Review; 2011-2012, 79 Fed. Reg. 36,721 (Dep't Commerce Jun. 30, 2014)

("Final Results").  Before the court are the motions for judgment on the agency record pursuant

to U.S. Court of International Trade ("CIT") Rule 56.2 and accompanying memoranda in support

of Chinese producers Shijiazhuang Goodman Trading Co., Ltd. ("Goodman"); Jinan Farmlady

Trading Co., Ltd., Qingdao Xintianfeng Foods Co., Ltd., Shenzhen Bainong Co., Ltd., Jining

Yifa Garlic Produce Co., Ltd., Weifang Hongqiao International Logistics Co., Ltd., Yantai

Jinyan Trading, Inc. (collectively, "QXF"); Hebei Golden Bird Trading Co. Ltd. ("Golden

Bird"), and Shenzhen Xinboda Industrial Co., Ltd. ("Xinboda").  See Mem. in Supp. of the Mot.

of Pl. Shijiazhuang Goodman Trading Co., Ltd. for J. on the Agency R., ECF No. 31 ("Goodman

Br."); Mem. in Supp. of Mot. for J. on the Agency R. Filed by Qingdao Xintianfeng Foods Co.,

Ltd., et al., ECF No. 32 ("QXF Br."); Mem. in Supp. of the Mot. of Pl. Hebei Golden Bird

Trading Co. Ltd. for J. on the Agency R., ECF No. 43 ("Golden Bird Br."); Consol. Pl. Shenzhen

Xinboda Indus. Co., Ltd. Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 44 ("Xinboda

Br.").  Also before the court is a motion filed by the Fresh Garlic Producers' Association and its

individual members, Christopher Ranch L.L.C., Valley Garlic, The Garlic Company, and Vessey

and Company, Inc. (collectively, "FGPA").  Mem. of Law in Supp. of Pls.' Mot. for J. on the

Agency R., DE 41 ("FGPA Br.").  For the reasons stated below, Commerce's Final Results are

sustained in part and remanded in part.

## BACKGROUND

In November 1994, Commerce issued an AD duty order covering fresh garlic from the

PRC.  Antidumping Duty Order:  Fresh Garlic from the People's Republic of China, 59 Fed.

Reg. 59,209, 59,209 (Dep't Commerce Nov. 16, 1994).  Following requests from several

interested parties, Commerce initiated its eighteenth administrative review of that order on

December 31, 2012, with a period of review ("POR") of November 1, 2011, through October 31,

2012.[1]  Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request

for Revocation in Part, 77 Fed. Reg. 77,017, 77,019–22 (Dep't Commerce Dec. 31, 2012)

("Initiation Notice").  On April 15, 2013, Commerce selected as mandatory respondents the two

largest exporters by volume, Golden Bird and Xinboda.  Decision Memorandum for the

Preliminary Results of the 2011-2012 Antidumping Duty Administrative Review:  Fresh Garlic

from the People's Republic of China at 3, A-570-831, (Dec. 16, 2013), available at

http://enforcement.trade.gov/frn/summary/prc/2013-30660-1.pdf (last visited Nov. 18, 2015)

("Preliminary I&D Memo").  Commerce issued the preliminary results of its administrative

review on December 24, 2013, assigning weighted-average margins (based on dollars per

kilogram) of $1.17 for Golden Bird, $1.76 for Xinboda, $1.47 for QXF and other separate rate

respondents, and $4.71 for the PRC-wide entity.[2]  Fresh Garlic from the People's Republic of

China:  Preliminary Results and Partial Rescission of the 18th Antidumping Duty Administrative

Review; 2011-2012, 78 Fed. Reg. 77,653, 77,654 (Dep't Commerce Dec. 24, 2013)

("Preliminary Results").

---

[1] Commerce must annually review and determine the amount of an AD duty if it receives a
request to do so.  See 19 U.S.C. § 1675(a) (2012).

[2] In the non-market economy ("NME") context, Commerce has adopted a rebuttable presumption
that all companies within the NME country are subject to government control and, thus, should
be assessed a single AD duty rate.  Decision Memorandum for the Preliminary Results of the
2011-2012 Antidumping Duty Administrative Review:  Fresh Garlic from the People's Republic
of China at 5, A-570-831, (Dec. 16, 2013), available at http://enforcement.trade.gov/frn/
summary/prc/2013-30660-1.pdf (last visited Nov. 18, 2015) ("Preliminary I&D Memo").  Here,
because Commerce considers the PRC to be an NME, that rate is the PRC-wide rate.

The PRC is considered by Commerce to be a non-market economy ("NME").  In calculating a dumping margin for products from an NME country, Commerce compares the goods' normal value,[3] derived from factors of production ("FOPs") as valued in a surrogate market economy ("ME") country, to the goods' export price.[4]  Commerce must use the "best available information" in selecting surrogate data.  19 U.S.C. § 1677b(c)(1)(B) (2012).  The surrogate data must "to the extent possible" be from a market economy country that is "at a level of economic development comparable to that of the nonmarket economy country" and is a "significant producer[] of comparable merchandise."  Id. at § 1677b(c)(4).

In May 2013, Commerce placed on the record a list of potential surrogate countries based on economic comparability to the PRC, which included Colombia, Costa Rica, Indonesia, the Philippines, South Africa, and Thailand.  Preliminary I&D Memo at 9.  Commerce compiled this list based on World Bank per capita gross national income ("GNI") data.  See id. at 9–10.  Next, Commerce narrowed its list by identifying countries that it considered to be significant producers of fresh garlic.  Id. at 10.  To this end, Commerce eliminated Costa Rica due to its lack of garlic

---

[3] Normal value is

> the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price,

"at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(A),(B)(i).

[4] Export price is "the price at which the subject merchandise is first sold . . . before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States[.]"  19 U.S.C. § 1677a(a).

production in 2011 and South Africa because of conflicting data concerning whether or not it had

fresh garlic production in 2011.  Id. at 10–11.  Commerce then determined that of the remaining

surrogate countries, the Philippines offered the best quality data, and selected it as the surrogate

country.  Id. at 12.

With respect to the calculation of surrogate values, in its preliminary determination,

Commerce excluded from the pricing data all imports from NME countries and countries that

maintain broadly available, non-industry specific export subsidies.  Id. at 17.  To value the raw

garlic bulb input, Commerce relied on farm gate prices,[5] and for labor, Commerce relied on data

from the International Labor Organization ("ILO").  Id. at 18.

In April 2014, after the Preliminary Results, but before the Final Results, FGPA alleged

that Golden Bird had misreported its fresh garlic sales for the POR.  Issues and Decision

Memorandum for the Final Results of Antidumping Duty Administrative Review:  Fresh Garlic

from the People's Republic of China; 2011-2012 Administrative Review at 2, A-570-831, (Jun.

23, 2014), available at http://enforcement.trade.gov/frn/summary/prc/2014-15279-1.pdf (last

visited Nov. 18, 2015) ("I&D Memo").  In the Final Results, issued on June 30, 2014, Commerce

determined that it was within its discretion to accept FGPA's untimely allegations.  Id. at 30–31;

---

[5] In valuing the raw garlic bulb as an input for fresh garlic, Commerce used the intermediate input valuation methodology.  Preliminary I&D Memo at 18.  When using this methodology, Commerce "choos[es] to apply a surrogate value to an intermediate input instead of the individual FOPs used to produce that intermediate input."  Fresh Garlic from the People's Republic of China:  Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review and Preliminary Results of New Shipper Reviews, 70 Fed. Reg. 69,942, 69,947 (Dep't Commerce Nov. 18, 2005).  Here, Commerce calculated normal value by starting with the surrogate value for the raw garlic bulb and "adjusting for yield losses during the processing stages, and adding the respondent's processing costs, which were calculated using its reported usage rate for processing fresh garlic."  Preliminary I&D Memo at 16–17.

Final Results, 79 Fed. Reg. at 36,722.  After issuing a supplemental questionnaire, which Golden

Bird did not complete to Commerce's satisfaction, Commerce selected total adverse facts

available ("total AFA")[6] for Golden Bird.   I&D Memo at 33.  Commerce selected the PRC-wide

rate of $4.71 as Golden Bird's total AFA rate.  Id. at 39.

For the Final Results, Commerce continued to use the Philippines as the surrogate

country.  Id. at 10.  Commerce also continued to exclude NME country and export subsidy

country data from the import statistics used to calculate surrogate values.  Id. at 14–15.

Additionally, Commerce continued to rely on ILO data to calculate the labor surrogate value and

farm gate prices to calculate the raw garlic bulb surrogate value.  Id. at 17, 21.  Finally,

Commerce determined that net weight, as opposed to gross weight, was more accurate for

calculating surrogate values for Philippine importers' total input costs for fresh garlic production.

Id. at 18–19.  The Final Results assigned dumping margins of $1.82 to Xinboda, QXF, and other

separate rate respondents, and $4.71 for the PRC-wide entity, which included Golden Bird.  See

Final Results, 79 Fed. Reg. at 36,723.

With respect to Goodman, in the Preliminary Results, Commerce did not consider it for

separate rate (non-PRC-wide entity) treatment stating,

---

[6] Although the phrase "total AFA" is not referenced in either the statute or the agency's
regulations, it can be understood, within the context of this case, as referring to Commerce's
application of the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C.
§ 1677e to arrive at a total replacement margin.  If Commerce determines

> that an interested party has failed to cooperate by not acting to the best of its ability
> to comply with a request for information from [Commerce, Commerce, in
> calculating a dumping margin], may use an inference that is adverse to the interests
> of that party in selecting from among the facts otherwise available.

19 U.S.C. § 1677e(b)(1).

> [a]lthough Goodman had shipments during the POR of this administrative review, these shipments are being analyzed in a concurrent new shipper review.  Therefore, Goodman will not be analyzed for the purposes of a separate rate in this review but will maintain the rate it received from its new shipper review.

Preliminary I&D Memo at 6 (footnote omitted).  In the Final Results, Commerce determined that because it had concluded in the contemporaneous new shipper review ("NSR") that Goodman did not have any bona fide sales during the POR, it could not qualify for a separate rate in the administrative review.  I&D Memo at 40–41.  Commerce thus rescinded the administrative review for Goodman and ordered that "[a]ny entries entered during this POR shall liquidate as entered."  Id.

The parties challenge several aspects of Commerce's Final Results.  Golden Bird disputes three of Commerce's decisions.  First, Golden Bird challenges Commerce's determination that Golden Bird failed to cooperate to the best of its ability and subsequent selection of total AFA.  Golden Bird Br. at 16–20.  Second, Golden Bird contests Commerce's selection of the PRC-wide rate as its total AFA rate.  Id. at 20–28.  Third, Golden Bird claims that Commerce's so called "15-day policy"[7] is unlawful.  Id. at 28–34.

Goodman challenges two of Commerce's determinations.  First, Goodman disputes Commerce's rescission of its administrative review, arguing that a lack of bona fide sales is an insufficient reason to rescind a review.  Goodman Br. at 9–10.  Second, and alternatively, Goodman contests Commerce's application and calculation of the PRC-wide rate.  Id. at 11–15.

---

[7] This refers to Commerce's policy of issuing liquidation instructions to U.S. Customs and Border Protection ("Customs") fifteen days after the publication of its Final Results.  Golden Bird Br. at 28–29.

QXF and Xinboda each challenge two of Commerce's decisions.  First, both parties

contest Commerce's selection of the Philippines as the PRC's surrogate country.  QXF Br. at 7–

10; Xinboda Br. at 3–41.  Second, QXF and Xinboda otherwise challenge whether Commerce

satisfied its statutory duty to use the best available information to calculate surrogate values for

fresh garlic production.  QXF Br. at 10–17; Xinboda Br. at 41–45.  Finally, FGPA challenges

Commerce's use of farm gate prices in calculating the surrogate value of the raw garlic bulb

input.  FGPA Br. at 17–27.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Commerce's final results in

an administrative review of an AD duty order are upheld unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

**DISCUSSION**

**I.      Golden Bird**

   A.  <u>Specific Facts</u>

In the <u>Preliminary Results</u>, Commerce determined that Golden Bird was independent of

Chinese governmental control, selected it as a mandatory respondent, and assigned it a separate

rate of $1.17 per kilogram.  <u>See</u> <u>Preliminary Results</u>, 78 Fed. Reg. at 77,653–54.  On April 7,

2014, after the <u>Preliminary Results</u> were published, FGPA submitted factual allegations that

Golden Bird's Section A responses were incorrect because the volume of shipments included

items not reported to Chinese customs.  Petitioners' Request for Investigation of Substantial

Discrepancies Between Golden Bird's Volume of POR Exports Reported to Commerce/CBP and

Chinese Customs Authorities, bar code 3194440 (Apr. 7, 2014) ("Petitioners' Golden Bird

Export Volume Request").  Commerce accepted FGPA's untimely[8] request and asked Golden

Bird to verify the amount of garlic it exported by producing the China Export Declaration Forms

("CEDFs") for all shipments through a supplemental questionnaire.  Suppl. Quest., bar code

3200154-01 (May 7, 2014) ("Golden Bird Suppl. Quest.").  Commerce also accepted FGPA's

designation of the data underlying FGPA's allegations as business proprietary information

("BPI").  I&D Memo at 31.  Commerce granted Golden Bird two extensions of time, until May

23, 2014, to submit the information.  See Resp. to First Ext. Req., PD 335 (May 9, 2014); Resp.

to Suppl. Quest. at 1, PD 350 (May 23, 2014).  When Golden Bird was unable to produce

sufficient evidence to substantiate its reported sales quantity, Commerce determined that Golden

Bird had significantly impeded the proceedings and that it could not trust any of Golden Bird's

submissions, including its Separate Rate Certification.  I&D Memo at 33–39.  Thus, in its final

determination, Commerce determined that Golden Bird had failed to cooperate to the best of its

ability, selected total AFA, and assigned Golden Bird the PRC-wide rate of $4.71 per kilogram.

Id. at 39.

       Golden Bird argues that Commerce's decision to allow FGPA to file new allegations long

past the deadline for submitting information was an abuse of discretion, and that Commerce's

designation of the data relied on by FGPA in making the untimely allegations as BPI was

improper and denied Golden Bird due process.  Golden Bird Br. at 16–18.  Golden Bird further

argues that Commerce improperly selected total AFA because Golden Bird cooperated to the

---

[8] The parties agree FGPA's submission was untimely.  Golden Bird Br. at 6; see Def.'s Resp. to
Pl.'s Mots. for J. upon the Agency R. 15–16, ECF No. 57 ("Gov. Br.").

best of its ability and was not given a sufficient amount of time in which to comply with

Commerce's request for information.[9]  Id. at 18–20.  In challenging its total AFA rate, Golden

Bird argues that Commerce improperly disregarded its Separate Rate Certification and assigned

Golden Bird the PRC-wide rate, which is unconnected to commercial reality and uncorroborated.

Id. at 20–28.  Finally, Golden Bird argues that Commerce's 15-day policy is unlawful because it

conflicts with the AD statute, Commerce's regulations, and the court's jurisdictional rules.  Id. at

28–34.

       The government responds that Commerce properly allowed FGPA's late allegations, and

that the designation of the data as BPI was proper and did not deny Golden Bird its due process

rights.  Def.'s Resp. to Pl.'s Mots. for J. upon the Agency R. 19–23, ECF No. 57 ("Gov. Br.").

The government also argues that Commerce properly selected total AFA, given the significant

discrepancies in Golden Bird's submissions and Golden Bird's failure to cooperate to the best of

its ability.  Id. at 23, 26–31.  The government further responds that, because none of Golden

Bird's submissions could be considered, Commerce properly selected the PRC-wide rate as

Golden Bird's total AFA rate.  Id. at 31.  The government also argues that Commerce properly

selected and corroborated the PRC-wide rate.  Id. at 31, 33–37.  Finally, the government argues

that the court does not have jurisdiction over Golden Bird's 15-day policy challenge, and that

even if it did, the policy is lawful.  Id. at 60–69.

---

[9] Golden Bird also argues that the allegations were based on unreliable data.  As discussed in the
I&D Memo, however, Commerce issued the supplemental questionnaire not based on the data
alone, but on the documented allegation, irregularities in Golden Bird's reporting, and concerns
from Commerce's prior Golden Bird verification.  See I&D Memo at 31.

The court holds that Commerce's decision to allow the untimely allegations, designation

of the supporting data as BPI, and selection of total AFA are supported by substantial evidence.

Commerce's selection of the PRC-wide rate as Golden Bird's total AFA rate because it

considered Golden Bird part of the PRC, however, is not supported by substantial evidence and

the court remands the calculation of Golden Bird's AFA rate to Commerce for recalculation.

The court also holds that it does not have jurisdiction over Golden Bird's 15-day policy

challenge.

B.  Acceptance of FGPA Allegations

   1. *Untimeliness*

Under 19 C.F.R. § 351.301(b)(2) (2011), the deadline for submitting factual allegations is

140 days after the anniversary month of the AD duty order.  Commerce has "discretion in

setting, extending, and enforcing deadlines" for submissions.  Artisan Mfg. Corp. v. United

States, 978 F. Supp. 2d 1334, 1342 (CIT 2014).  Commerce may extend a deadline for "good

cause."  See 19 C.F.R. § 351.302(b) (2011).[10]  Though that discretion is not unlimited, where

there is evidence of fraud, Commerce should consider the evidence even when submitted late in

the proceeding.  See Home Prods. Int'l, Inc. v. United States, 633 F.3d 1369, 1377–78 (Fed. Cir.

2011) (noting that Commerce has the ability to reopen an AD administrative review when fraud

allegations arise); Tokyo Kikai Seisakusho, Ltd. v. United States, 529 F.3d 1352, 1361 (Fed. Cir.

---

[10] The regulation has since been amended to require a showing of "extraordinary circumstances" for an untimely filed extension request.  See 19 C.F.R. § 351.302(c) (2014).  Because Commerce initiated the administrative review under consideration on December 31, 2012, Initiation Notice, 77 Fed. Reg. 77,019–22, the amended regulation, which applies to segments "initiated on or after October 21, 2013" is not applicable here.  Extension of Time Limit, 78 Fed. Reg. 57,790, 57,790 (Dep't Commerce Sept. 20, 2013).  Golden Bird does not argue that FGPA was required to show extraordinary circumstances.

2008) ("An agency's power to reconsider is even more fundamental when . . . it is exercised to

protect the integrity of its own proceedings from fraud."); <u>US Magnesium LLC v. United States</u>,

895 F. Supp. 2d 1319, 1325 (CIT 2013) (holding that Commerce abused its discretion where it

failed to address evidence of fraud raised while the record was still open).

 Here, Commerce did not abuse its discretion in allowing the late allegations from FGPA.

FGPA certified that it did not have the information earlier in the proceeding, and Golden Bird

has not provided evidence that FGPA had the information prior to submitting it.  More

importantly, the allegations raised serious questions about the veracity of Golden Bird's

submissions and the possibility that Golden Bird was engaged in fraudulent activity.  Namely, if

the discrepancy between the volumes of goods reported to Chinese authorities and U.S. Customs

and Border Protection ("Customs") was due to the fact that Golden Bird was allowing other

Chinese exporters to benefit from its separate rate status, it could indicate a perverse and

fraudulent scheme to avoid AD duties.  A concern about such a scheme meets the good cause

standard for extending a time limit.  Additionally, nothing in the regulations precluded

Commerce from accepting the late submission.  <u>See</u> 19 C.F.R. § 351.302(b).  Commerce's

determination that FGPA presented sufficient good cause to accept the late submission is

sustained.

  *2.  Designation of FGPA Submissions as "Business Proprietary Information"*

 When a party designates information as BPI in a submission, Commerce may not disclose

that information without the party's consent.  <u>See</u> 19 U.S.C. § 1677f(b)(1)(A).  "If [Commerce]

determines, on the basis of the nature and extent of the information or its availability from public

sources, that designation of [the] information as [BPI] is unwarranted," then Commerce may ask

the submitting party to explain why the designation is warranted.  19 U.S.C. § 1677f(b)(2).

Here, Commerce did not determine that the designation was unwarranted.

FGPA had a legitimate concern that disclosure of the information would harm its

competitive position because the identity of the foreign researcher who gathered the information

was important to its business.  In Max Fortune Industrial Ltd. v. United States, the court upheld

the treatment of the name of a researcher as BPI because to reveal the name "could prove a

danger to the researcher and the researcher's methods of obtaining information in the future."

853 F. Supp. 2d 1258, 1266 (CIT 2012).  The court noted that counsel in that case had access to

the relevant information under the Administrative Protective Order ("APO") and that the party in

that case "was provided with sufficient public information to have notice of, and respond to, the

allegations made against it."  Id. at 1267.  The same is true here.  Golden Bird's counsel had

access to the information under the APO and Golden Bird was provided with the total Chinese

shipment information such that it had notice of, and could adequately respond to, the allegation

that the Chinese shipment volumes did not match its Section A responses.  See Golden Bird's

Cmts. on Petitioners' Export Volume Request at 2–4, barcode 3196023 (Apr. 16, 2014); Pls.'

Reply to the Resps. of Def. and Def.-Intvrs. to Pls.' Rule 56.2 Mots. for J. upon the Agency R. at

8–9, ECF No. 65 ("Golden Bird and Goodman Reply Br.").  Disclosure of the researcher's

identity could prevent that researcher from assisting FGPA in the future, to the detriment of

FGPA's business.  Accordingly, Commerce's decision not to challenge FGPA's designation of

the information as BPI is supported by substantial evidence.

Additionally, the designation of the information as BPI did not deny Golden Bird due

process because Golden Bird had notice of Commerce's decision and an opportunity to respond

to the allegations.  See Sichuan Changhong Elec. Co. v. United States, 30 CIT 1886, 1890, 466

F. Supp. 2d 1323, 1327 (2006) (holding that in order to succeed on a due process claim the party

had to show that its opportunity to be heard was "unreasonably curtailed").  The public version

of FGPA's submission contained the relevant information, namely the total quantity of fresh

garlic reported to Chinese authorities and the amount of the alleged discrepancy between that

quantity and the quantity reported to Customs.  See Petitioners' Golden Bird Export Volume

Request at 2.  Further, the data concerned Golden Bird's own shipping information, and Golden

Bird presumably had access to the same information from internal sources.  Thus, Golden Bird

had sufficient notice of the information contained in the allegation to rebut it.  Golden Bird was

also allowed to present arguments against the BPI treatment of the data as well as the underlying

factual allegations before Commerce.  See Golden Bird's Cmts. on Petitioners' Export Volume

Request at 5–7.  Accordingly, its opportunity to be heard was not unreasonably curtailed.

Because Golden Bird had access to the relevant information and had an opportunity to be heard

to rebut the information, there was no due process violation and Commerce's determination is

supported by substantial evidence.

    C.   Selection of Total Adverse Facts Available

    By statute, Commerce shall use facts otherwise available if a party:

(A) withholds information that has been requested by [Commerce],
(B) fails to provide such information by the deadlines for submission of the
information or in the form and manner requested . . . ,
(C) significantly impedes a proceeding . . . , or
(D) provides such information but the information cannot be verified . . . .

19 U.S.C. § 1677e(a)(2).  Commerce may apply an adverse inference in selecting from the facts

otherwise available if the party "has failed to cooperate by not acting to the best of its ability to

comply with a request for information."  19 U.S.C. § 1677e(b).  This is referred to as applying

AFA.  Commerce has discretion over whether to apply or not apply AFA.  See AK Steel Corp. v.

United States, 28 CIT 1408, 1416–17, 346 F. Supp. 2d 1348, 1355 (2004).  The issue of whether

a respondent has acted to the best of its ability and whether applying AFA is appropriate

"amounts to a line-drawing exercise that is precisely the type of discretion left within the

agency's domain."  Ta Chen Stainless Steel Pipe Co. v. United States, 31 CIT 794, 812 (2007)

(quoting Boading Yude Chem. Indus. Co. v. United States, 25 CIT 1118, 1126, 170 F. Supp. 2d

1335, 1343 (2001)) (internal quotation marks and brackets omitted).

        The Federal Circuit has described the application of AFA as a two part inquiry.  First,

Commerce must determine whether it has received less than the full and complete facts needed

to make a determination because a party has failed to provide requested information within the

deadline for submission.  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir.

2003).  If so, Commerce must fill gaps in the record with facts otherwise available.  Id.  The

focus of this first inquiry is whether a party failed to provide information; a party's reason for

that failure is irrelevant.  Id.  Commerce is permitted to draw an adverse inference, however,

only if it makes the second, separate determination that the respondent "has failed to cooperate

by not acting to the best of its ability to comply."  Id.  Commerce is also required by statute to

provide a party with the opportunity to correct deficient responses prior to applying AFA.  19

U.S.C. § 1677m(d).

        A respondent fails to cooperate to the best of its ability when it fails "to do the maximum

it is able to do."  Nippon Steel, 337 F.3d at 1382.  The standard in 19 U.S.C. § 1677e(b) "does

not condone inattentiveness, carelessness, or inadequate record keeping."  Id.  In determining

whether a party has failed to do the maximum it is able to do, Commerce employs another two-

part test.  Id. at 1382.  First, Commerce "make[s] an objective showing that a reasonable and

responsible importer would have known that the requested information was required to be kept

and maintained under the applicable statutes, rules, and regulations."  Id.  Second, Commerce

> make[s] a subjective showing that the respondent under investigation not only has
> failed to promptly produce the requested information, but further that the failure to
> fully respond is the result of the respondent's lack of cooperation in either:
> (a) failing to keep and maintain all required records, or (b) failing to put forth its
> maximum efforts to investigate and obtain the requested information from its
> records.

Id. at 1382–83.

Depending on the severity of a party's failure to respond to a request for information and

failure to cooperate to the best of its ability, Commerce may select either partial or total AFA.

Generally, the "use of partial facts available is not appropriate when the missing information is

core to the antidumping analysis and leaves little room for the substitution of partial facts

without undue difficulty."  Mukand, Ltd. v. United States, 767 F.3d 1300, 1308 (Fed. Cir. 2014).

Where there are "pervasive and persistent deficiencies that cut across all aspects of the data," all

of the reported information may be unreliable, making total AFA appropriate.  See Zhejiang

DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011).

Commerce's selection of AFA is supported by substantial evidence.   First, Commerce's

determination that Golden Bird's response to its supplemental questionnaire was deficient is

supported by substantial evidence.  Golden Bird produced partially completed CEDFs for only a

fraction of the sales during the POR.  See Golden Bird Suppl. Quest. Resp. at 1, barcode

3204165 (May 23, 2014) (indicating that Golden Bird was providing "some" of the requested

CEDFs).  The documents Golden Bird did produce lacked the official stamps and indicia of

authenticity that would allow the documents to be verified.  See id. at Ex. 3; see also I&D Memo

at 33.  Further, Golden Bird admitted to intentionally reporting false pricing information on the

documents submitted.  Golden Bird Rebuttal Br. at 7–8, barcode 3208559 (Jun. 12, 2014).

Accordingly, it was reasonable for Commerce to determine that Golden Bird failed to comply

with Commerce's request for information, thereby significantly impeding the proceeding.

Second, Commerce provided Golden Bird with an adequate opportunity to cure its

deficient response.  Golden Bird acknowledged in its Supplemental Questionnaire Response that

it was not providing Commerce with all of the requested documentation, attempted to justify its

deficient response, and argued that it would have been able to provide a more adequate response

had it been given more time.  Golden Bird Suppl. Quest. Resp. at 4–5.  Commerce determined

that Golden Bird's justifications were unsubstantiated and unsatisfactory, and hence, that no

additional time to respond was warranted.  I&D Memo at 34–38.  Commerce's rejection of

Golden Bird's explanations was reasonable.  Golden Bird claimed that the CEDFs could not be

recovered in the amount of time allotted because they were retained by the numerous export

agents Golden Bird used but, provided no evidence that it used numerous export agents, or that it

had attempted to contact such agents to obtain the CEDFs.  Golden Bird Suppl. Quest. Resp. at

3–4; I&D Memo at 35.  Golden Bird also claimed that it did not retain the CEDFs because of

office space concerns, despite the fact that the documents could have been stored electronically,

and were required to be maintained under Chinese regulations.  See id. at 36–37.  Additionally,

Golden Bird acknowledges that the forms it did provide contained intentional inaccuracies.  See

Golden Bird Rebuttal Br. at 7–8.  Further, Golden Bird's alternative method of verifying its

reported volume was insufficient, as it failed to account for over half of Golden Bird's reported

sales.  See Golden Bird Suppl. Quest. Resp. at 4–5; Golden Bird and Goodman Reply at 10.

With respect to the amount of time Golden Bird had to respond, not only did Golden Bird receive

two time extensions, but it received double the amount of time parties typically have to prepare

for verification.  I&D Memo at 34.  Verification is a far more intensive review process, and

Commerce routinely requests export licenses similar to the CEDFs requested in the

Supplemental Questionnaire during verification.  Id.  Golden Bird thus had the opportunity to

explain its failure to comply with the information request in the Supplemental Questionnaire, and

Commerce acted reasonably in determining that its explanations were lacking.[11]

Third, Commerce's determination that Golden Bird failed to cooperate to the best of its

ability is supported by substantial evidence.  As discussed above, Golden Bird's explanations for

failing to file all of the requested CEDFs are unsubstantiated and unreasonable.  See I&D Memo

at 35–37; Golden Bird Suppl. Quest. Resp. at 3–4 (indicating that if any export agent was used,

the same export agent was used for each shipment and failing to explain why documents could

_____

[11] The court notes that although Commerce specifically noted that Golden Bird's response to its
Supplemental Questionnaire was deficient, in determining whether Golden Bird was provided
with notice and given an adequate opportunity to correct its deficient response, Commerce stated
that it "allowed Golden Bird to provide documentation to support what appeared to be a deficient
section A response."  I&D Memo at 34.  Thus, it is not abundantly clear whether Commerce is
resting its determination on the deficient nature of Golden Bird's Section A Response or
Supplemental Questionnaire Response.  Such lack of clarity, however, does not render
Commerce's determination unsupported by substantial evidence.

Golden Bird does not argue that Commerce failed to follow 19 U.S.C. § 1677m(d) in
selecting total AFA.  If Golden Bird's deficient response was its Section A Response, the
Supplemental Questionnaire provided a sufficient opportunity for Golden Bird to remedy or
explain the deficiency.  If the deficient response was the Supplemental Questionnaire Response,
Golden Bird likely still received an adequate opportunity to remedy or explain the deficiency,
given the time constraints Commerce was operating under, the late nature of the allegations, the
two time extensions granted, and the fact that Golden Bird acknowledged its response was
deficient and attempted to justify such deficiency in the Supplemental Questionnaire Response.

not have been stored electronically).  As the CEDFs that Golden Bird failed to produce are

required to be maintained for three years by Chinese customs regulations, Golden Bird's failure

to maintain them is evidence of its failure to cooperate to the best of its ability.  <u>I&D Memo</u> at

38–39.  Golden Bird maintains that it acted to the best of its ability because it provided

alternative evidence that it was the exporter of the quantity of fresh garlic reported.  Golden Bird

Br. at 19.  This alternate evidence, however, only accounted for a portion of the alleged Golden

Bird sales.  Accordingly, the alternative evidence did nothing to cure the deficient response.[12]

Golden Bird did not explain why it did not supply alternative evidence for all of its alleged

shipments.  The acknowledged price discrepancies between the evidence Golden Bird submitted

in its Supplemental Questionnaire Response and reported to Customs further indicate that

Golden Bird was not completely candid with Commerce, and are additional evidence of Golden

Bird's failure to cooperate to the best of its ability.  Thus, none of Golden Bird's arguments

attempting to rationalize or explain its failure to provide the requested documents are persuasive;

accordingly, Commerce's decision to select AFA is supported by substantial evidence.

Given the severity of Golden Bird's failure to cooperate and the centrality of the deficient

response to the calculation of a dumping margin, Commerce properly selected total AFA.

Golden Bird's sales volume is fundamental to the AD analysis, and was a critical component in

Golden Bird's selection as a mandatory respondent.  <u>I&D Memo</u> at 38–39.  It is thus akin to the

failure to provide product-specific sales and cost data, which the Federal Circuit determined was

---

[12] Golden Bird attempts to argue that the Chinese customs data is inaccurate and is responsible
for the discrepancies between the reported volumes.  Golden Bird Br. at 19.  In fact, the amount
reported in the Supplemental Questionnaire Response is closer to the amount reported to Chinese
customs than it is to the amount reported to Customs and listed in Golden Bird's Section A
Response.  <u>I&D Memo</u> at 27.

sufficient to select total AFA in <u>Mukand, Ltd. v. United States</u>, 767 F.3d at 1307.  Because the

sales data concerned the entire POR, this case is also distinguishable from <u>Zhejiang DunAn</u>

<u>Hetian Metal Co. v. United States</u>, where Commerce selected partial AFA to account for

discrepancies in sales volume for one month of the period of investigation.  652 F.3d at 1345–46,

1348 (reversing selection of partial AFA on other grounds).  Further, Golden Bird's argument

that it substantially complied with Commerce's document request is meritless; Golden Bird

acknowledges that the documents submitted account for less than half of its reported sales

volume.  Golden Bird and Goodman Reply at 10.  Additionally, the fact that Golden Bird

intentionally submitted false pricing information also supports Commerce's determination that

all of Golden Bird's sales information was unreliable.  <u>See</u> <u>Foshan Shunde Yongjian Housewares</u>

<u>& Hardware Co. v. United States</u>, Slip Op. 11-123, 2011 WL 4829947, at *14 (CIT Oct. 12,

2011) (holding that total AFA was appropriate where deficient responses concerned a substantial

portion of a party's production inputs); <u>Shanghai Taoen Int'l Trading Co. v. United States</u>, 29

CIT 189, 199 n.13, 360 F. Supp. 2d 1339, 1348 n.13 (2005) (upholding selection of total AFA

where inconsistencies concerned the identity of a party's suppliers).  Thus, Commerce's decision

to select total AFA is supported by substantial evidence.

   D.  <u>Selection of the PRC-Wide Rate</u>

     As discussed above, Commerce's selection of total AFA is supported by substantial

evidence; Commerce's further selection of the PRC-wide rate, however, is not.  Commerce

improperly ignored Golden Bird's Separate Rate Certification in selecting the PRC-wide rate as

Golden Bird's total AFA rate.

    *1.  Commerce's Calculation*

    In an AD review of products from an NME country, Commerce employs a presumption

of state control.  See Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1372 (Fed.

Cir. 2003).  Unless a party rebuts the presumption by establishing de jure and de facto

independence from the NME country's government, that party is assigned a country-wide AD

duty rate.  Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997); Peer Bearing

Co.-Changshan v. United States, 32 CIT 1307, 1309, 587 F. Supp. 2d 1319, 1324 (2008).  Once a

party has demonstrated its independence and been granted a separate rate in one segment of the

proceeding, it can demonstrate its separate rate status eligibility by filing a separate rate

certification stating that it continues to meet the criteria for obtaining a separate rate.  See

Initiation Notice, 77 Fed. Reg. at 77,018–19.

    Golden Bird filed a separate rate certification, which Commerce determined was

sufficient in the Preliminary Results.  See Preliminary I&D Memo at 6, 8.  Commerce thus had

previously determined that Golden Bird was entitled to a separate rate and preliminarily

determined that Golden Bird continued to meet the criteria for obtaining a separate rate.  See id.

at 6.  The government argues that because of the pervasive nature of Golden Bird's failure to act

to the best of its ability, Commerce could not rely on the information in Golden Bird's Separate

Rate Certification in the Final Results.  Gov. Br. at 31.  According to Commerce's logic, because

the only information on the record in the administrative review of Golden Bird's independence

from government control was contained in the Separate Rate Certification that Commerce

disregarded, Golden Bird failed to rebut the presumption of government control and was

properly assigned the PRC-wide rate.  See id.  The government's argument improperly conflates

the separate rate analysis with the selection of an AFA rate.

The court has held that the separate rate analysis is separate and distinct from the

selection of an AFA rate.  Yantai Xinke Steel Structure Co. v. United States, Slip Op. 12-95,

2012 WL 2930182, at *14 (CIT July 18, 2012) ("This Court has consistently held that it is

unreasonable for Commerce to impute the unreliability of a company's questionnaire responses

and submissions concerning its factors of production and/or U.S. sales to its separate rate

responses when there is no evidence on the record indicating that the latter were false,

incomplete, or otherwise deficient.").  Commerce cannot ignore a party's separate rate

information solely because it selects total AFA, due to defects related to sales data.  Foshan

Shunde, 2011 WL 4829947 at *16; Since Hardware (Guangzhou) Co. v. United States, Slip Op.

10-108, 2010 WL 3982277, *5–6 (CIT Sept. 27, 2010); Qingdao Taifa Grp. Co. v. United States,

33 CIT 1090, 1098, 637 F. Supp. 2d 1231, 1240–41 (2009); Shandong Huarong Gen. Grp. Corp.

v. United States, 27 CIT 1568, 1595–96 (2003).  Commerce's determination that a party is not

entitled to a separate rate because its separate rate information is unreliable must be based on

substantial evidence.  See Gerber Food (Yunnan) Co. v. United States, 29 CIT 753, 772, 387 F.

Supp. 2d 1270, 1287 (2005).  When Commerce fails to make findings that a respondent's

separate rate responses were inaccurate or deficient, its denial of a separate rate is unsupported

by substantial evidence.  Yantai Xinke, 2012 WL 2930182 at *14.

Here, Commerce, having found the Separate Rate Certification sufficient, failed to make

a new finding that Golden Bird's Separate Rate Certification was deficient in any respect.  In

fact, Commerce's determination to disregard Golden Bird's Separate Rate Certification was

limited to two sentences in the I&D Memo. I&D Memo at 39 ("Because we determine that the

entirety of Golden Bird's information is unusable, including its separate rate information, we

find that Golden Bird has not demonstrated its eligibility for separate rate status. As a result, for

purposes of these final results, we are treating Golden Bird as part of the PRC-wide entity.").

Thus, Commerce's rejection of Golden Bird's separate rate status is based solely on the

discrepancies in its questionnaire responses and supplemental questionnaire responses related to

sales volume, neither of which concerned Golden Bird's independence from government control.

To suddenly decide that Golden Bird, which has long been considered to be independent, see,

e.g., Fresh Garlic Producers Ass'n v. United States, 83 F. Supp. 3d 1330, 1332 (CIT 2015), is

part of the Chinese government because of sales data defects smacks of punishment. The general

presumption of state control is tenuous at best and rejecting Golden Bird's rebuttal evidence on

the discrete point of government control is not reasonable. Remand is thus appropriate in this

case, as Commerce's determination is not based on record evidence specific to the question of

whether Golden Bird is subject to state control. See Gerber Food, 29 CIT at 772, 387 F. Supp.

2d at 1287.

 2. *Applicable Law*

 The parties do not agree as to the applicable law for selecting a separate rate for Golden

Bird. On June 29, 2015, President Obama signed the Trade Preferences Extension Act of 2015

("the Act"). Pub. L. No. 114-27, 129 Stat. 362 (2015). Section 502 of the Act ("§ 502" or

"Section 502") amends 19 U.S.C. § 1677e, which sets the standard by which Commerce may

select AFA rates. Id. § 502, 129 Stat. at 383–84. Namely, § 502 significantly reduces the burden

for corroborating an AFA rate, as Commerce does not have to corroborate an AD duty rate that

has been applied in a separate segment of the same proceeding.  Commerce is also no longer

required to tie an AD duty margin to the "commercial reality" of the interested party.  Compare

id. § 502(d)(3), 129 Stat. at 384 ("If [Commerce] uses an adverse inference . . . [Commerce] is

not required . . . to demonstrate that the . . . dumping margin used by [Commerce] reflects an

alleged commercial reality of the interested party."), with Gallant Ocean (Thai.) Co. v. United

States, 602 F.3d 1319, 1324 (Fed. Cir. 2010) ("Although Commerce has discretion in choosing

from a list of secondary information to support its adverse inferences, Commerce must select

secondary information that has some grounding in commercial reality.").

Given the significant changes to the statute outlined in § 502, whether the Act applies to

the court's remand affects whether Commerce is required to corroborate Golden Bird's AFA rate

and link it to Golden Bird's commercial reality and whether separate rate status has any practical

significance in a total AFA situation.  For example, in Qingdao Taifa Group Co. v. United States,

the court held that Commerce could not select a PRC-wide rate as an AFA rate when the party

had established its independence from government control, even where the selection of AFA was

appropriate in other respects.  33 CIT at 1098–99, 637 F. Supp. 2d at 1240–42.  The court stated,

"[b]ecause an AFA rate must bear some relationship to the respondent's actual dumping margin,

Commerce's ability to apply the PRC-wide rate as respondent's AFA rate is limited."  Id. at

1098, 637 F. Supp. 2d at 1240.

Under Bradley v. School Board of City of Richmond, courts are instructed "to apply the

law in effect at the time it renders its decision."  416 U.S. 696, 711 (1974).  A statute will not be

given retroactive effect, however, unless there is clear congressional intent, effectively creating a

presumption against retroactivity.  Landgraf v. USI Film Prods., 511 U.S. 244, 270 (1994).

When a statute does not have express retroactive language, the court determines whether

applying the statute to the case at hand would allow the statute to have retroactive effect.  Id. at

280.  Retroactive effect is determined by looking at whether applying the statute "would impair

rights a party possessed when he acted, increase a party's liability for past conduct, or impose

new duties with respect to transactions already completed.  If the statute would operate

retroactively, our traditional presumption teaches that it does not govern absent clear

congressional intent favoring such a result."  Id.  In Republic of Austria v. Altmann, the Supreme

Court described this inquiry as whether the relevant activity that the statute regulates occurred

after the effective date of the statute.  541 U.S. 677, 697 n.17 (2004) (quoting Landgraf, 511 U.S.

at 291 (Scalia, J., concurring)).  In Fernandez-Vargas v. Gonzales, the court stated that a

retroactive consequence of applying a statute would "affect[] substantive rights, liabilities, or

duties on the basis of conduct arising before its enactment."  548 U.S. 30, 37 (2006) (quoting

Landgraf, 511 U.S. at 278) (internal brackets omitted).

        The parties agree that § 502 does not apply to the court's present review of the Final

Results.  Cmts. on Ct.'s Letter of July 30, 2015 5–7, ECF No. 78 (Sept. 3, 2015) ("Golden Bird,

Goodman, and QXF Suppl. Br."); Consol. Pl. Shenzhen Xinboda Indus. Co., Ltd. Suppl. Br. in

Resp. to Ct.'s Questions 2–3, ECF No. 79 (Sept. 3, 2015) ("Xinboda Suppl. Br."); Domestic

Indus.'s Resp. to the Ct.'s July 30, 2015 Letter Requesting Suppl. Briefing 3–4, ECF No. 80

(Sept. 3, 2015) ("FGPA Suppl. Br."); Def.'s Resp. to the Ct.'s July 30, 2015 Order Requesting

Suppl. Briefing 3, ECF No. 81 (Sept. 3, 2015) ("Gov. Suppl. Br.").  The parties disagree,

however, as to whether § 502 will apply to a remand determination.  The government concedes

that the relevant portions of the Act do not have any retroactive language and are not intended to

apply retroactively.  Gov. Suppl. Br. at 4–5.  Instead, the government argues that because a

remand determination is a new action by Commerce, as opposed to an action by a party, the

application of § 502 to a remand determination is not retroactive.  Id.  FGPA agrees with the

government that Commerce may apply the Act on remand without retroactive effect.  FGPA

Suppl. Br. at 4–5.  Golden Bird argues that applying § 502 on remand would improperly convert

the Act from being remedial to punitive, and would be a retroactive application.  Golden Bird,

Goodman, and QXF Suppl. Br. at 5–7.

        Section 502 does not have an express effective date.  Commerce issued an interpretive

rule indicating that the Act is to have prospective effect only, and that § 502 will apply to

determinations made by Commerce on or after August 6, 2015.  Dates of Application of

Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences

Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015)

("Interpretive Rule").  The Federal Circuit recently held that § 502 has prospective effect and

does not apply to "final administrative determinations that remain subject to judicial review."

Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1350 (Fed. Cir. 2015)

("Ad Hoc Shrimp").  Accordingly, as the Final Results are a "final administrative determination"

currently subject to judicial review, and predate the enactment of the Act, the court did not apply

§ 502 in reviewing the Final Results.

        Although the Federal Circuit did not directly address whether § 502 applies to remand

determinations in Ad Hoc Shrimp, the analysis the court conducted in holding that § 502 does

not apply to determinations currently subject to judicial review is instructive.  Id. at 1351 n.12.

In holding that § 502 operates prospectively, the court noted that "[a] statute shall not be given

retroactive effect unless such construction is required by explicit language or by necessary

implication." Id. at 1349 (quoting Fernandez-Vargas, 548 U.S. at 37).  The court then looked to

the text of § 502, which contains no express effective date or language concerning the section's

temporal reach.  Id. at 1350–51.  Next, the court relied on the normal rules of statutory

construction and held that those rules precluded the application of § 502 to the appeal before the

court.  The court noted that when the normal rules of statutory construction do not dictate a

statute's proper reach, the court "ask[s] whether applying the statute . . . would have a retroactive

consequence in the disfavored sense of affecting substantive rights, liabilities, or duties on the

basis of conduct arising before its enactment." Id. at 1350 (quoting Fernandez-Vargas, 548 U.S.

at 37) (internal quotation marks omitted).

        Neither § 502's text nor its legislative history expressly states that § 502 is retroactive or

applies to remand determinations of cases that were subject to judicial review at the time of its

enactment.  See S. Rep. No. 114-45, at 37 (2015) (discussing § 501, ultimately enacted as § 502).

Based on the normal rules of statutory construction, § 502 is not intended to apply retroactively.

Congress provided explicit effective dates for other provisions in the Act, both preceding and

following the date of enactment, indicating that had Congress intended the Act to have

retroactive effect, it would have said so.  Ad Hoc Shrimp, 802 F.3d at 1350–51 (discussing the

statutory principle allowing a presumption of intent when Congress includes language in one

statutory provision that is excluded from another provision).  This is particularly relevant given

the simultaneous enactment of the provisions with specified effective dates and § 502.  See id. at

1351 ("The more apparently deliberate the contrast, the stronger the inference, as applied, for

example, to contrasting statutory sections originally enacted simultaneously in relevant

respects.") (quoting <u>Field v. Mans</u>, 516 U.S. 59, 75 (1995)).  Because § 502 is not intended to

have retroactive effect, the next question is whether applying § 502 to a remand determination

will result in the retroactive application of § 502.

In <u>Landgraf v. USI Film Products</u>, the Supreme Court reasoned that "[a] statute does not

operate 'retrospectively' merely because it is applied in a case arising from conduct antedating

the statute's enactment."  511 U.S. at 269.  Rather, the court determined that it must evaluate

"familiar considerations of fair notice, reasonable reliance, and settled expectations" to

determine whether applying the statute would have retroactive effect.  <u>Id</u> at 270.  The court

explained the rationale for this rule:

> Requiring clear intent assures that Congress itself has affirmatively considered the
> potential unfairness of retroactive application and determined that it is an
> acceptable price to pay for the countervailing benefits.  Such a requirement
> allocates to Congress responsibility for fundamental policy judgments concerning
> the proper temporal reach of statutes, and has the additional virtue of giving
> legislators a predictable background rule against which to legislate.

<u>Id.</u> at 272–73.

The government and FGPA make much of the fact that § 502 regulates Commerce's

conduct in administrative proceedings, and that because a remand determination is a new

administrative proceeding, applying § 502 would not be retroactive.  They also make much of

the fact that trade remedies laws, including AD laws, are inherently retroactive and that no party

has a right to a certain rate of duty.  Consol. Pl. Shenzhen Xinboda Indus. Co., Ltd. Suppl. Br. in

Resp. to Court's Questions Ex. 2, ECF No. 79 (Gov. Suppl. Br. at 2, ECF No. 85, <u>Ad Hoc

Shrimp</u>, No. 2014-1647 (Aug. 27, 2015) (citing <u>SKF USA, Inc. v. United States</u>, 537 F.3d 1373,

1380–81 (Fed. Cir. 2008); <u>Arjay Assocs., Inc. v. Bush</u>, 891 F.2d 894, 897 (Fed. Cir. 1989)).  As

support for this in its supplemental brief filed before the Federal Circuit in <u>Ad Hoc Shrimp</u>, the

government cited SKF USA, Inc. v. United States, where the Federal Circuit relied on the

retrospective nature of duties and held that a change in Commerce's methodologies between

administrative reviews was acceptable.  Id.; see 537 F.3d at 1380–81.  As this case concerns a

change between an original determination and a remand determination rather than between

separate administrative reviews, it is readily distinguishable.  The government and FGPA, thus,

have misunderstood the critical conduct at issue.  The relevant decision does not concern

entitlement to a particular rate of duty or the retrospective nature of the trade laws.  Rather, it

concerns the decision Commerce made when it selected total AFA for Golden Bird.  The date

Commerce made that determination is controlling, as it is the date on which the decision was

made that affected Golden Bird's rights.  See Martin v. Hadix, 527 U.S. 343, 357–58 (1999)

("The inquiry into whether a statute operates retroactively demands a commonsense, functional

judgment about whether the new provision attaches new legal consequences to events completed

before its enactment.") (quoting Landgraf, 511 U.S. at 270) (internal quotation marks omitted).

        In Travenol Laboratories, Inc. v. United States, the Federal Circuit held that applying a

statutory provision, which was amended after final judgment was awarded by the CIT, but prior

to certain entries' re-liquidation, would not result in the retroactive application of that provision.

118 F.3d 749, 752–54 (Fed. Cir. 1997).  Central to the court's holding was that the provision

concerned the calculation of interest, which was not determined until the entries were re-

liquidated.  Id. at 753.  In reaching that conclusion, the court stated that the retroactivity analysis

"focuse[s] on the interrelationship between the new law and past conduct . . . [and] depends upon

whether the conduct that allegedly triggers the statute's application occurs before or after the

law's effective date."  Id. at 752 (internal quotation marks and citation omitted).  Thus, this case

is distinguishable, as the crucial moment for retroactivity in this case is not liquidation, but

rather, Commerce's determination that Golden Bird failed to cooperate to the best of its ability

and selected total AFA.  Because Commerce's decision to select total AFA occurred prior to

§ 502's enactment, applying § 502 on remand would be an impermissible retroactive application.

       To apply § 502 on remand would be in effect to apply the law retroactively by applying it

to a determination that occurred before the new law became effective.  It would also serve to

treat parties differently merely because Commerce made an error in one case and not in another

decided at the same time.  Additionally, the court rejects the argument that the Act is merely a

restatement of the law and does not change the standard by which it selects an AFA rate.  The

Federal Circuit interpreted the AFA provisions of the old law as requiring corroboration of the

rate so that there was some basis in the commercial reality of a respondent.  See, e.g., Gallant

Ocean, 602 F.3d at 1324.  In contrast, the Act permits Commerce to select a rate that is

unconnected to such commercial reality.  Section 502 thus clearly diverges from the prior

statutory AFA standard as interpreted by binding Federal Circuit precedent such that application

of the new standard would be an impermissible retroactive application.

       The government's reliance on Potomac Electrical Power Co. v. United States, as support

for applying § 502 on remand is also misplaced.  584 F.2d 1058 (D.C. Cir. 1978).  Although that

case did order an agency to apply a new law on remand after finding that the agency's

determination did not satisfy the previously-applicable legal standard, Potomac is a pre-Landgraf

case, and the court applied a different, now-inapplicable standard.  Id. at 1066–67.  Specifically,

the court determined that the agency should apply the law in effect at the time of a decision

unless it would be manifestly unjust to do so.  Id. at 1066.  This is in stark contrast to Landgraf's

presumption against retroactivity.  See Landgraf, 511 U.S. at 265, 270.

Accordingly, § 502 of the Act does not apply to the remand determination ordered in this

case and Commerce is instructed not to apply the standards contained in § 502 on remand.

E.  Fifteen-Day Liquidation Policy

Golden Bird next challenges Commerce's 15-day liquidation policy.  Golden Bird Br. at

28–34.  Golden Bird argues that Commerce's policy ignores 19 U.S.C. § 1516a and CIT Rule

3(a)(2)'s 30-day time limit for filing cases before the CIT, Commerce's own timeline for filing

ministerial error allegations (within 30 days) under 19 C.F.R. § 351.224, and 19 U.S.C.

§ 1675(a)(3)(B), which provides "[l]iquidation shall be made . . . to the greatest extent

practicable, within 90 days after the instructions to Customs are issued."  Golden Bird Br. at 29–

31.  The government responds that the court lacks jurisdiction under 28 U.S.C. § 1581(c) to hear

this claim, and that Golden Bird has not been harmed by this policy as its entries have not yet

been liquidated.  Gov. Br. at 60–63.  The government further argues that even if the court does

have jurisdiction, Commerce's policy permissibly fills a statutory gap.  Id. at 60, 63.

Although Golden Bird brought its claim under § 1581(c) jurisdiction, and filed its

summons and complaint separately, it asks the court to consider its argument under either

§ 1581(c) or § 1581(i) jurisdiction.  Golden Bird and Goodman Reply at 18–19; Summons at 3,

Hebei Golden Bird Trading Co. v. United States, No. 14-00163 (July 7, 2014), ECF No. 1;

Compl. at 2, Hebei Golden Bird Trading Co. v. United States, No. 14-00163 (July 7, 2014), ECF

No. 7.  Golden Bird claims the liquidation instructions are an integral part of the Final Results

and are thus reviewable under § 1581(c), and alternatively, that given the similarity between

§ 1581(c) and § 1581(i) jurisdiction, the court should analyze the issue even if they are not an integral part of the <u>Final Results</u>.  Golden Bird and Goodman Reply at 18–19.  Golden Bird's arguments are without merit.

As regards Golden Bird individually, there has been no showing of injury that the court can address as its entries have not been liquidated and will not be liquidated until this litigation is complete.  That is, it moved swiftly and obtained injunctive relief before liquidation instructions were acted upon.  <u>See</u> Statutory Inj., <u>Hebei Golden Bird Trading Co. v. United States</u>, No. 14-00163 (July 17, 2014), ECF No. 9.  Additionally, because other cases have addressed Commerce's 15-day liquidation policy, the issue has not evaded judicial review, at least to the extent of the granting of declaratory relief.  <u>See, e.g.</u>, <u>NTN Bearing Corp. of America v. United States</u>, 46 F. Supp. 3d 1375, 1380–81, 1383–88 (2015) (exercising § 1581(i) jurisdiction in § 1581(c) case over 15-day policy challenge where parties properly followed procedures for filing a § 1581(i) case); <u>Mittal Steel Galati S.A. v. United States</u>, 31 CIT 730, 736–38, 491 F. Supp. 2d 1273, 1280–82 (2007) (addressing 15-day policy in a § 1581(c) case where Commerce directly addressed the policy in the issues and decision memorandum and where the parties did not challenge the court's jurisdiction).  Although there is a serious issue as to whether Commerce acts lawfully when it forces a party into court before the statutory time for commencing suits, if Golden Bird seeks a remedy on this issue going forward it needs to properly file a case under § 1581(i) seeking broader injunctive relief.  There is no remedy that the court can give in this case on this complaint that will ameliorate this situation.

**II.     Goodman**

A.  <u>Specific Facts</u>

Goodman requested both an NSR and an administrative review on November 27, 2012.

<u>Fresh Garlic from the People's Republic of China:  Initiation of Antidumping Duty New Shipper</u>

<u>Review; 2011-2012</u>, 78 Fed. Reg. 88, 89 (Dep't Commerce Jan. 2, 2013); Goodman's Req. for

Administrative Review, bar code 3107472 (Nov. 27, 2012).  Goodman requested that Commerce

accept its Section A Questionnaire Response filed in its NSR in lieu of a separate rate application

in the administrative review proceeding on February 15, 2013.  Goodman's Request for

Department to Accept SAQR Resp. in Lieu of Separate Rate Application, bar code 3119618-01

(Feb. 15, 2013).  In its <u>Preliminary Results</u>, Commerce did not consider Goodman for a separate

rate because Goodman had filed a concurrent NSR and Commerce stated that Goodman would

receive the rate determined in the NSR.  <u>Preliminary I&D Memo</u> at 6.  Goodman's NSR was

rescinded on April 21, 2014, because Commerce concluded that Goodman did not have any <u>bona</u>

<u>fide</u> sales during the POR.  <u>Fresh Garlic from the People's Republic of China:  Final Rescission</u>

<u>of Antidumping Duty New Shipper Review of Shijiazhuang Goodman Trading Co., Ltd.</u>, 79 Fed.

Reg. 22,098, 22,098–99 (Dep't Commerce Apr. 21, 2014).  Thereafter, Commerce rescinded

Goodman's administrative review because, based on the results of the NSR, Goodman did not

have any reviewable sales during the POR.  <u>I&D Memo</u> at 40–41.  In effect, Goodman was

subject to the PRC-wide rate.

Goodman alleges that Commerce improperly excluded it from the eighteenth

administrative review because Goodman is <u>de facto</u> and <u>de jure</u> independent from the Chinese

government and is thus entitled to a separate rate.  Goodman Br. at 10.  Specifically, Goodman

argues that a lack of <u>bona fide</u> sales is an improper basis on which to rescind an administrative

review, and that Commerce's action was arbitrary and capricious because Commerce did not

examine the <u>bona fides</u> of any other respondents' sales.  <u>Id.</u>  Goodman further contends that

because it is independent of government control, Commerce's failure to assign it a separate rate

was a failure to perform a ministerial act.  <u>Id.</u> at 11.  Finally, Goodman challenges the validity of

the PRC-wide rate, arguing that it is punitive and invalid, as it is out of date and divorced from

commercial reality.  <u>Id.</u> at 11–15.

 The government responds that because Goodman's sales during the POR were not

commercially reasonable, there were no reviewable sales during the POR.  Gov. Br. at 11.

Accordingly, Commerce properly rescinded the administrative review.  <u>Id.</u>  Additionally, the

government and FGPA argue that it was not arbitrary or capricious to examine only Goodman's

<u>bona fides</u> because none of the other separate rate respondents filed an NSR.  <u>Id.</u> at 12; Domestic

Indus.'s Resp. in Opp'n to Foreign Exps.' Mots. for J. on the Agency R. at 39–40, ECF No. 58

("FGPA Resp.").  Although the rescission of the administrative review resulted in the application

of the PRC-wide rate, FGPA argues that the rate was not applied in the administrative review,

but rather, Commerce's action allowed the determination made during the NSR to stand.  FGPA

Resp. at 40–41.  The government argues that the PRC-wide rate should be challenged in the NSR

review.  <u>See</u> Gov. Br. at 12.  Thus, neither the government nor the FGPA believe it is proper to

address Goodman's PRC-wide rate challenge in this case, and the court agrees.

 B.  <u>Application of the PRC-Wide Rate</u>

 Under 19 U.S.C. § 1675(a)(2), in an administrative review, Commerce is instructed to

evaluate each entry.  Under 19 C.F.R. § 351.213(d)(3), Commerce "may rescind an

administrative review . . . if [Commerce] concludes that, during the period covered by the

review, there were no entries, exports, or sales of the subject merchandise." Here, Commerce

relied on its determination in the NSR and rescinded the administrative review because

Goodman did not have any <u>bona fide</u> sales during the POR, and there were no non-related entries

at issue.[13] Golden Bird, Goodman, and QXF Suppl. Br. at 1–2; Gov. Suppl. Br. at 2.

In evaluating the <u>bona fides</u> of entries, Commerce is permitted to exclude certain sales

when they are unrepresentative or extremely distortive. <u>See</u> <u>Windmill Int'l Pte., Ltd. v. United

States</u>, 26 CIT 221, 224, 193 F. Supp. 2d 1303, 1307 (2002); <u>FAG U.K., Ltd. v. United States</u>, 20

CIT 1277, 1281–82, 945 F. Supp. 260, 265 (1996). "Given Commerce's discretion in employing

a methodology to exclude sales . . . that are unrepresentative or distortive, that is, non-bona fide

ones, the Court must determine whether Commerce's actions in this case were reasonable."

<u>Windmill</u>, 26 CIT at 230, 193 F. Supp. 2d at 1312. Here, Commerce's actions were reasonable

as it cannot evaluate a company for application of a separate rate to its sales when there are no

sales that are not unrepresentative or distortive. As there were no reviewable entries, Commerce

properly rescinded the review. Because all of the sales were not <u>bona fide</u>, there were no sales

within the POR for which Commerce could grant Goodman a separate rate.

Goodman argues that it was arbitrary and capricious of Commerce to examine the <u>bona

fides</u> of its sales when it did not examine the <u>bona fides</u> of any other separate rate respondents'

sales. Goodman, however, ignores the fact that no other separate rate respondent filed an NSR,

and, accordingly, Commerce had a reasonable explanation for why it treated Goodman

---

[13] The court uses sales and entries interchangeably because the distinction has no import on these facts.

differently.  When Goodman filed the NSR hoping for expedited review, it became subject to the

potential negative impact of that review on the administrative review.  See 19 C.F.R.

§§ 351.214(i) (indicating that an NSR decision is to be issued no later than 450 days after its

initiation), 351.213(h) (indicating than an administrative review decision is to be issued no later

than 545 days after the last day of the anniversary month).  Additionally, once Commerce had

the information concerning the non-bona fides of Goodman's sales it could not ignore that

relevant information.  Floral Trade Council of Davis v. United States, 13 CIT 242, 242, 709 F.

Supp. 229, 230 (1989).  Finally, because Commerce properly rescinded the administrative

review, refusing to grant Goodman a separate rate was not a failure to perform a ministerial act.

Neither party has presented persuasive argument or binding case law concerning

Commerce's proper actions where a company may be independent of government control, but

has no reviewable entries.  At the present time, it appears that Commerce simply assumes that

there are not entries of real sales of an independent company.  Although the court again notes its

skepticism as to the factual basis underlying the presumption of state control, at least for some

sectors of the Chinese economy, Goodman has not challenged that presumption and the court

will not make such an argument on its behalf.  See Henderson ex rel. Henderson v. Shineski, 562

U.S. 428, 434 (2011) ("Under [the adversarial] system, Courts are generally limited to

addressing the claims and arguments advanced by the parties."); see also Castro v. United States,

540 U.S. 375, 386 (2003) (Scalia, J., concurring) ("Our adversary system is designed around the

premise that the parties know what is best for them, and are responsible for advancing the facts

and arguments entitling them to relief.").  Thus, Commerce's refusal to conduct an

administrative review and the resulting subsequent application of the PRC-wide rate is supported

by substantial evidence.  Any challenge to the PRC rate as applied to Goodman may only

proceed in the challenge to the NSR results and not here.

### III.    Surrogate Country Selection

Xinboda and QXF challenge Commerce's selection of the Philippines as the primary

surrogate country.  Xinboda Br. at 3; QXF Br. at 7.  Specifically, Xinboda contends that

Commerce erred when it treated economic comparability as a "threshold" test for surrogate

country selection.  Xinboda Br. at 13.  Xinboda argues that instead, economic comparability

should have been concurrently weighed against the other factors impacting Commerce's

selection of a surrogate country—significance of production, merchandise comparability, and

data quality.  Id. at 14.  Xinboda argues that had Commerce considered these factors

simultaneously, it would have selected India, or alternatively, Thailand, as its primary surrogate

country.  Id. at 13, 18.  Conversely, the government asserts that economic comparability is

indeed a "threshold" test for surrogate country selection and cites the language of 19 U.S.C.

§ 1677b(c)(4) as support.  Gov. Br. at 46–48.

Both Xinboda and QXF challenge Commerce's determination that the Philippines is a

significant producer of fresh garlic.  Xinboda Br. at 22–24; QXF Br. at 8–10.  These respondents

contend that a country must produce a comparatively large quantity of merchandise to be

designated a significant producer.  Xinboda Br. at 24–25; QXF Br. at 8–9.  Arguing that the

quantity of production is not the sole determiner of significant producer status, the government

dismisses their contention.  Gov. Br. at 51.

Finally, Xinboda argues that India and Thailand offered better quality data than the

Philippines.  Xinboda Br. at 26–32, 34–36. The government responds that the Philippines offered

the best available information because it was the only economically comparable country that

offered tax and duty-free data that were linked to a governmental source.  Gov. Br. at 45, 53.

As discussed in further detail below, the court holds that although it may have been

permissible for Commerce to start its analysis by looking at economic comparability, its ultimate

selection of the Philippines is not supported by substantial evidence because that country is not a

significant producer of fresh garlic under any reasonable criterion selected to date.

A.  Surrogate Country Selection Process

To calculate the normal value of merchandise exported from NME countries, Commerce

uses surrogate values—the costs of producing comparable merchandise in economically

comparable ME countries.  19 U.S.C. § 1677b(c)(4).  Prior to calculating surrogate values,

however, Commerce must select a country from which to derive these surrogate values.  This

requires Commerce to engage in a multi-part process, which in an ordinary case should result in

a usable surrogate country.  Dorbest Ltd. v. United States, 30 CIT 1671, 1679, 462 F. Supp. 2d

1262, 1271 (2006); see also Policy Bulletin 04.1, Non-Market Economy Surrogate Country

Selection Process (Mar. 1, 2004), available at http://enforcement.trade.gov/ policy/bull04-1.html

(last visited Nov. 20, 2015) ("Policy Bulletin 04.1").[14]  Initially, Commerce compiles a list of

ME countries that are economically comparable to the NME country.  Policy Bulletin 04.1.

Commerce then identifies which of the listed countries produces comparable merchandise.  Id.

---

[14] This bulletin is a compilation of the International Trade Administration's guidelines for
antidumping administrative reviews.  Though not binding authority, courts, including this one,
view this bulletin as indicative of Commerce's best practices and statutory interpretations for
reviews of AD duty orders.  See, e.g., DuPont Teijin Films v. United States, 997 F. Supp. 2d
1338, 1342–45 (CIT 2014); Foshan Shunde Yongjian Housewares & Hardwares Co. v. United
States, 896 F. Supp. 2d 1313, 1320–23 (CIT 2013).

Next, Commerce identifies the countries on the list that are significant producers of the subject

merchandise.  Id.  Commerce selects from the remaining countries the one that provides the best

available and highest quality data as the primary surrogate country.  Id.

 *1.  Economic Comparability*

 Commerce is to value the FOPs from an ME country which is "at a level of economic

development comparable" to the NME country.  19 U.S.C. § 1677b(c)(4)(A).  Although the

statute does not define comparable economic development,[15] because per capita GNI is a

"consistent, transparent, and objective measure to determine economic comparability," courts

have concluded that Commerce's use of this information is a reasonable interpretation of its

statutory duty.  See Jiaxing Brother Fastener Co. v. United States, 961 F. Supp. 2d 1323, 1328,

1330 (CIT 2014) (noting that GNI is both similar to, and more accurate than, Gross Domestic

Product ("GDP"), which 19 C.F.R. § 351.408(b) indicates is proper for Commerce to use); see

also Fujian Lianfu Forestry Co. v. United States, 33 CIT 1056, 1077, 638 F. Supp. 2d 1325, 1349

(2009) (explaining that per capita GNI data provide Commerce with a broad sense of countries'

varying levels of economic development).

 Once countries are placed on Commerce's list of economically comparable ME countries,

Commerce does not evaluate how closely each country's per capita GNI reflects that of the NME

---

[15] When Commerce interprets the AD statutes to which it must adhere in conducting an
administrative review of an AD duty order, the court conducts a two-part test, under Chevron,
U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), to determine
whether that interpretation is entitled to deference.  Where Congress has spoken directly to the
question at issue, Commerce must give effect to the unambiguously expressed intent of
Congress.  Id. at 842–43.  If, however, the statute is vague or silent on an issue, the court upholds
Commerce's interpretation so long as the interpretation is reasonable.  See id. at 843; DuPont
Teijin Films USA, LP v. United States, 27 CIT 962, 965–66, 273 F. Supp. 2d 1347, 1351 (2003).

country at issue.  See Tehnoimportexport v. United States, 15 CIT 250, 255–56, 766 F. Supp.

1169, 1175 (1991) (explaining that the statutory mandate is simply to ensure that the surrogate

country is a comparable economy, not the most comparable economy).  Instead, Commerce

considers each of these listed countries to be equally economically comparable to the NME

country.  Policy Bulletin 04.1; see Tehnoimportexport, 15 CIT at 255, 766 F. Supp. at 1175.

Xinboda contends that Commerce should have selected Thailand as the primary surrogate

country, because its per capita GNI for the relevant period was closest to that of the PRC.

Xinboda Br. at 32.  As the court has held before, however, "the law does not require [Commerce]

to choose the most comparable economy, but rather a comparable economy."

Tehnoimportexport, 15 CIT at 256, 766 F. Supp. at 1175.  Because with regard to economic

comparability both Thailand and the Philippines "reasonably could have been selected as

surrogates," the court will not disturb Commerce's selection of the Philippines merely because

Thailand's per capita GNI was closer to that of the PRC.  Id.  Other problems remain, however.

    2.  *Significant Producer*[16]

Next, Xinboda and QXF contend that the Philippines is not a significant fresh garlic

producer, because it produces considerably less than either India or Thailand.  Xinboda Br. at 22;

QXF Br. at 8–9.  Arguing that "significant producer" is not necessarily synonymous with

"largest producer," the government defends Commerce's selection of the Philippines as the

PRC's surrogate country.  Gov. Br. at 51.  The government further argues that Philippine

production only appears to be de minimis when compared to that of the PRC, the world's largest

---

[16] No parties contest Commerce's determination in the surrogate country selection process that
the countries on the list produce comparable merchandise.

fresh garlic producer.  Id.  The court, however, is not convinced by the government's arguments,

and concludes that Commerce's determination is not supported by substantial evidence.

When selecting a surrogate country, Commerce "shall utilize, to the extent possible, the

prices or costs of factors of production in one or more market economy countries that are . . .

significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  There is no

statutory definition of "significant producer"; however, the International Trade Administration

("ITA") offers some guidance on how to interpret the term.  Policy Bulletin 04.1.  The ITA

explains that Commerce should not compare production levels in the NME country and the

potential surrogate countries in order to identify significant producers.  Id.  Instead, Commerce

should define "significant producer" in relation to world production and trade.  Id.; see DuPont

Teijin Films v. United States, 997 F. Supp. 2d 1338, 1342 (CIT 2014).

Because the court has previously held, and it adheres to that view, that significant

producer "is not statutorily defined, and is inherently ambiguous," the only question to be

answered is whether Commerce's definition of significant producer is "based on a permissible

construction of the statute."  Shandong Rongxin Imp. & Exp. Co. v. United States, 774 F. Supp.

2d 1307, 1316 (CIT 2011) (quoting Chevron, 467 U.S. at 843).

The court has suggested that an interpretation of "significant producer" countries as those

whose domestic production could influence or affect world trade would be a permissible

construction of the statute.  Id.  This follows from the plain meaning of the word "significant" as

something "having or likely to have influence or effect."  Significant, Webster's Third New

International Dictionary, (1981).  This definition, however, necessarily requires comparing

potential surrogate countries' production to world production of the subject merchandise.  Upon

doing so, it becomes clear that the Philippines is not a significant producer of garlic under

Commerce's normal definition of the term.  Worldwide production of fresh garlic in 2011 was

over 23 million metric tons.  See Golden Bird's Submission of Surrogate Country Selection

Cmts. and Surrogate Value Info. at Ex. 1, PD 110–15 (June 26, 2013).  That same year,

Philippine production totaled 9,056 metric tons, or less than 0.04% of the worldwide total.  Id.  It

cannot be plausibly maintained that the Philippines' miniscule garlic production had any

meaningful effect on world trade.

Commerce nonetheless argues that this case required a different approach because the

output of the PRC—far and away the world's largest—causes all other countries' production to

appear minimal by comparison.  Gov. Br. at 51.  Therefore, the court must determine whether it

was permissible for Commerce to identify as significant producers those countries whose

production has no meaningful effect on the world garlic trade, but whose production quantity

Commerce determined was significant.  It is difficult to determine whether Commerce's alternate

methodology rested on a permissible construction of the statute, because Commerce has not

explained the criteria upon which it relied in concluding that the Philippines was a significant

producer of fresh garlic.  The court concludes that although Commerce analyzed the significance

of the quantity of fresh garlic production, in reality, it improperly determined that a country was

a significant producer if it had "any commercially meaningful production."

A deviation from Commerce's normal approach is reasonable in situations where there

are only a handful of producers of comparable merchandise in the entire world.  See Policy

Bulletin 04.1 (giving the example of a situation where only three countries produce the goods in

question).  This, however, is not a situation in which there are so few producers of fresh garlic

that "any commercially meaningful production is significant." Id. In fact, the U.N. lists over

ninety-six countries as producers of fresh garlic. Golden Bird's Submission of Surrogate

Country Selection Cmts. and Surrogate Value Info. at Ex. 1. Although not all of these countries

are significant producers, this suggests that there was no need for Commerce to deviate from its

usual interpretation of significant producer, as there are a multitude of countries engaged in the

production of fresh garlic. Still, Commerce is free to depart from its prior practice in evaluating

whether a country is a significant producer, so long as that evaluation rests on a reasonable

interpretation of the statutory language.

   In its I&D Memo, Commerce notes that a country's production in comparison to the

worldwide total "is but one lens that [Commerce] utilizes" in making its determination. I&D

Memo at 7. "Here," Commerce continues, "[we] relie[d] on a different lens" to conclude that

"the quantity [of garlic] produced in the Philippines surely qualifies as significant." Id. at 8. The

problem is that Commerce never specifies what this "different lens" was. Commerce was

equally conclusory in its Preliminary I&D Memo, where it produced a table of the garlic

production of six countries economically comparable to the PRC, stating—without elaboration—

that "[t]his production data indicates that [five of the countries, including the Philippines] are

significant producers of comparable merchandise." Preliminary I&D Memo at 10. The

production of the five "significant" countries ranged from 1,500 to almost 76,000 metric tons,

meaning that the production of countries deemed significant varied by a factor of fifty. See id.

On the other hand, the sixth country considered—and the only one deemed non-significant—had

no garlic production whatsoever. Id. Where more than a mere handful of garlic-producing

countries compete on the global market, there is little justification for interpreting significant

production to mean simply "non-zero" production.  See Dorbest Ltd. v. United States, 789 F.

Supp. 2d 1364, 1371 (CIT 2011) (concluding that Commerce erred when it identified Equatorial

Guinea as a significant producer of wooden bedroom furniture despite the fact that the country's

exports were de minimis).

What is clear from Commerce's actions, however, is that its interpretation of significant

producer involved no comparative analysis.  By removing the comparative aspect of the

significant producer analysis, and not specifying the criteria on which it relied to determine that

the quantity of production was significant, Commerce erred and its determination is not

supported by substantial evidence.  The court is therefore unpersuaded that Commerce's

identification of the Philippines as a significant producer of fresh garlic was based on a

reasonable interpretation of the statute.  Thus, the court remands this issue to Commerce for

reconsideration.[17]

3.  *Data Quality*

Finally, both Xinboda and QXF contend that there were potential surrogate countries,

specifically India and Thailand, which offered better quality data than the Philippines.  Xinboda

at 26–36; QXF Br. at 9.  Commerce did not evaluate the Indian data's quality because India was

not economically comparable to the PRC.  See I&D Memo at 10.  Commerce concluded that the

---

[17] Upon remand, Commerce can decide to compile a second list of potential surrogate countries.
DuPont Teijin Films v. United States, 896 F. Supp. 2d 1302, 1306–07 (CIT 2013).  To do so,
Commerce must redo its multi-part surrogate country selection process.  Policy Bulletin 04.1.  If
Commerce does not identify significant producers on this second list, "[Commerce] may find it
is appropriate to rely on data from other countries," potentially including India.  Issues and
Decision Memorandum for the Final Results of the Second Administrative Review of Certain
Steel Threaded Rod from the People's Republic of China, A-570-932, at 4 (Nov. 5, 2012),
available at http://enforcement.trade.gov/frn/summary/prc/2012-27438-1.pdf (last visited Nov.
20, 2015).

Thai data were of lesser quality than the Philippine data because Commerce was unable to

confirm that the former were duty-exclusive, tax-exclusive, and linked to a governmental

source.[18]  Id.

Because there is not substantial evidence to support Commerce's selection of the

Philippines as the PRC's surrogate country, the court need not determine whether the Philippines

provided the best quality data.

B.  Exclusion of India

Xinboda also challenges Commerce's use of economic comparability as a "threshold"

test for surrogate country selection.  Xinboda argues that if Commerce had instead weighed all of

the surrogate country selection criteria simultaneously, Commerce would have placed India on

its list of potential surrogate countries.  Xinboda Br. at 13.  In addition, Xinboda argues that

because there were no economically comparable significant producers of fresh garlic with quality

data, India should have been considered as a surrogate country, notwithstanding its exclusion

from Commerce's initial list.  Id. at 14, 17.  Although in this case Commerce likely did not err in

initially excluding India from its list of comparable countries, the court agrees with Xinboda that

India may have to be considered as a potential surrogate country on remand.

In compiling its initial list of potential surrogate countries, Commerce typically treats

economic comparability as a first step.  See Policy Bulletin 04.1 at n.2 (explicitly rejecting an

alternative method whereby the statutory factors are considered simultaneously and weighed

against one another).  By restricting its list of potential surrogate countries to those that are

---

[18] The court is unclear about whether a "governmental source" implies reliability versus
particular private sources.

economically comparable to the NME country in a normal case, Commerce can better ensure

that its normal value calculation accurately reflects the cost of producing the subject merchandise

in a hypothetical ME country.

There are cases where Commerce recognizes that economic comparability should not be

considered as a first step.  See Policy Bulletin 04.1.  Generally this is when the subject

merchandise is "unusual or unique," often because only a few countries produce it, or because

"major inputs are not widely traded internationally."  Id.  Therefore, Commerce almost always

compiles its initial list of potential surrogate countries exclusively on the basis of economic

comparability.  Id.  There are two situations in which it is appropriate for Commerce to select a

surrogate country that is not on this initial list:  (1) when Commerce is unable to identify a

significant producer among the potential surrogate countries on its list; and (2) when Commerce

is unable to obtain data of a sufficiently high quality from any of the potential surrogate countries

on its list.  Id.

Xinboda argues that India, as "the only country that can truly be considered a significant

garlic producer after China," should have been selected as the primary surrogate country.

Xinboda Br. at 23.  Xinboda also notes that India "had been used as a surrogate country in all

reviews of fresh garlic from China" in the past, up through the sixteenth administrative review.

Id. at 22.  Although this latter observation is true, by the eighteenth administrative review,

Commerce determined—and Xinboda conceded—that India was no longer economically

comparable to the PRC on the basis of per capita GNI.[19]  I&D Memo at 6; Xinboda Br. at 16; see

---

[19] The World Bank reports that India's 2011 per capita GNI was $1,410—less than a third of the
PRC's per capita GNI ($5,000) for the same year.  GNI per capita, Atlas Method (Current US$),
(continued . . .)

also Ad Hoc Shrimp Trade Action Comm. v. United States, 882 F. Supp. 2d 1366, 1372 n.9,

1374–76 (CIT 2012) (remanding Commerce's selection of India as the PRC's surrogate country,

in part, because Commerce paid little attention to the fact that India's 2008 per capita GNI was

approximately one-third of the PRC's for that same year).  Fresh garlic is neither unique nor

unusual merchandise,[20] and there is no indication that key inputs are not widely traded.  Thus,

Commerce likely did not err in employing its usual practice of treating economic comparability

as a first step.

Nonetheless, here, Commerce might have to consider India as a potential surrogate

country.  The government argues that the exceptions to the normal rule do not apply here, as

Commerce determined that there was an economically comparable significant producer with

quality data on its initial list, namely the Philippines.  I&D Memo at 5–10.  As discussed above,

however, this determination was not supported by substantial evidence.  If, on remand,

Commerce can identify on its list at least one economically comparable significant producer

which has reliable data, then its decision to exclude India will remain supported by substantial

---

(continued . . .)
The World Bank, available at http://data.worldbank.org/indicator/NY.GNP.PCAP.CD/countries
(last visited Nov. 20, 2015).

[20] The court points to the Philippines' ranking as the forty-fourth world producer of fresh garlic
as evidence that too many countries produce fresh garlic for it to be considered unique or unusual
merchandise.  See Xinboda Br. at 22–24 (citing 2011 statistics that the Food and Agricultural
Organization of the United Nations collected about worldwide fresh garlic production).  But see
Crawfish Processors Alliance v. United States, 28 CIT 646, 654, 343 F. Supp. 2d 1242, 1250–51
 (2004) (concluding that Commerce's failure to apply economic comparability as a threshold test
and subsequent selection of Australia, an ME country, that was not economically comparable to
the PRC, the NME country, was supported by substantial evidence because Australia was the
only ME country that was also a significant live crawfish producer), rev'd on other grounds, 477
F.3d 1375 (Fed. Cir. 2007).

evidence.  See DuPont Teijin Films v. United States, 896 F. Supp. 2d 1302, 1306–07 (CIT 2013).

Otherwise, Commerce may have to expand its surrogate country list to include other ME

countries, possibly including India.[21]

## CONCLUSION

For the foregoing reasons, the Final Results are sustained in part and remanded in part.

On remand, Commerce is to consider evidence on the record concerning Golden Bird's

independence from government control to determine whether the company is entitled to separate

rate status based solely on that evidence.  If, upon remand, Commerce determines that Golden

Bird is entitled to separate rate status, it is to determine an appropriate AD margin specific to

Golden Bird, taking into consideration Commerce's determination, sustained here, to select total

AFA and applying the law extant at the time of the Final Results.  Finally, Commerce is to

reconsider its surrogate country selection in the light of the court's ruling concerning its

interpretation of "significant producer."  Commerce shall have until January 29, 2016, to file its

remand results.  The parties shall have until February 29, 2016, to file objections, and the

government shall have until March 14, 2016, to file its response.


Dated: November 30, 2015                            /s/ Jane A. Restani
       New York, New York                          Jane A. Restani
                                                        Judge

---

[21] There is no need to address specific surrogate value issues as there may be a new principal surrogate country selected.  The court suggests, however, that if the same surrogate data is used Commerce take a fresh look at its use of net weights and adjustments to import statistics and provide clear explanations for its decisions.