Slip Op. 16-68

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FRESH GARLIC PRODUCERS ASSOCIATION, CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, VALLEY GARLIC, and VESSEY AND COMPANY, INC., <br><br> Plaintiffs, <br><br> HEBEI GOLDEN BIRD TRADING CO. LTD., CHENGWU COUNTY YUANXIANG INDUSTRY & COMMERCE CO., LTD., QINGDAO XINTIANFENG FOODS CO., LTD., SHENZHEN BAINONG CO., LTD., YANTAI JINYAN TRADING, INC., JINING YIFA GARLIC PRODUCE CO., LTD., JINAN FARMLADY TRADING CO., LTD., WEIFANG HONGQIAO INTERNATIONAL LOGISTICS CO., LTD., and SHIJIAZHUANG GOODMAN TRADING CO., LTD., <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> SHENZHEN XINBODA INDUSTRIAL CO., LTD., JINXIANG MERRY VEGETABLE CO., LTD., and CANGSHAN QINGSHUI VEGETABLE FOODS CO., LTD., <br><br> Defendant-Intervenors. | Before: Jane A. Restani, Judge <br><br> Consol. Court No. 14-00180 |

## OPINION

[Commerce's final results of redetermination in antidumping duty administrative review sustained in part and remanded in part.]

Dated: July 7, 2016

Michael J. Coursey, John M. Herrmann, II, and Joshua R. Morey, Kelley Drye & Warren, LLP, of Washington, DC, for plaintiffs.

Robert T. Hume, Hume & Associates, LLC, of El Prado, NM, for consolidated plaintiffs Hebei Golden Bird Trading Co. Ltd., Qingdao Xintianfeng Foods Co., Ltd., Shenzhen Bainong Co., Ltd., Yantai Jinyan Trading, Inc., Jining Yifa Garlic Produce Co., Ltd., Jinan Farmlady Trading Co., Ltd., Weifang Hongqiao International Logistics Co., Ltd., and Shijiazhuang Goodman Trading Co., Ltd.

Yingchao Xiao and Jianquan Wu, Lee & Xiao, of San Marino, CA, and Robert T. Hume, Hume & Associates, LLC, of El Prado, NM, for consolidated plaintiff Chengwu County Yuanxiang Industry & Commerce Co., Ltd.

Richard P. Schroeder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Khalil N. Gharbieh, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, DC, for defendant-intervenor Shenzhen Xinboda Industrial Co., Ltd.

John J. Kenkel, deKieffer & Horgan PLLC, of Washington, DC, for defendant-intervenors Jinxiang Merry Vegetable Co., Ltd. and Cangshan Qingshui Vegetable Foods Co., Ltd.

Restani, Judge: Currently before the court are the United States Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Remand, ECF No. 88 ("Remand Results"), concerning the eighteenth annual administrative review of the antidumping ("AD") duty order on fresh garlic from the People's Republic of China ("PRC"). See Antidumping Duty Order: Fresh Garlic from the People's Republic of China, 59 Fed. Reg.

59,209, 59,209 (Dep't Commerce Nov. 16, 1994). The court remanded this matter to Commerce for reconsideration and further explanation of Commerce's AD duty margin for one of the mandatory respondents, Hebei Golden Bird Trading Co. Ltd. ("Golden Bird"), and Commerce's selection of the Philippines as the surrogate country. Fresh Garlic Producers Ass'n v. United States, 121 F. Supp. 3d 1313, 1328, 1340 (CIT 2015) ("FGPA").

## BACKGROUND

The court presumes familiarity with the facts of the case as discussed in FGPA, 121 F. Supp. 3d at 1317–20; however, the facts relevant to the Remand Results are summarized below for ease of reference.

To calculate the dumping margin in AD duty cases involving non-market economies ("NME"), Commerce compares the goods' normal value,[1] derived from factors of production ("FOP") as valued in a surrogate market economy, to the goods' export price.[2] 19 U.S.C. § 1677b(c). By statute, in selecting the surrogate country, Commerce, must use the "best

---

[1] Normal value is

> the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price,

"at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(A), (B)(i).

[2] Export price is "the price at which the subject merchandise is first sold . . . before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States[.]" 19 U.S.C. § 1677a(a).

available information," and choose a country "at a level of economic development comparable to that of the [NME, that is a] . . . significant producer of comparable merchandise."  Id.

For the eighteenth review, covering the period of review ("POR") from November 1, 2011 through October 31, 2012, Commerce selected Shenzhen Xinboda Industrial Co., Ltd. ("Xinboda") and Golden Bird as the mandatory respondents.  <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part</u>, 77 Fed. Reg. 77,017, 77,020–22 (Dep't Commerce Dec. 31, 2012).  In the <u>Fresh Garlic from the People's Republic of China:  Final Results and Partial Rescission of the 18th Antidumping Duty Administrative Review; 2011–2012</u>, 79 Fed. Reg. 36,721, 36,722 (Dep't Commerce June 30, 2014) ("<u>Final Results</u>"), Commerce selected total adverse facts available[3] ("total AFA") for Golden Bird and the PRC-wide rate[4] of $4.71/kg as Golden Bird's total AFA rate.  Golden Bird

---

[3] Although neither the statute nor the regulations explicitly use the phrase "total adverse facts available," the term refers to Commerce's use of "the facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e.  Under subsections (a) and (b) of that provision, if the "necessary information is not available on the record," or certain other similar circumstances are present, Commerce may rely on facts otherwise available, and if Commerce determines that an entity

> has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . , [Commerce, in calculating a dumping margin] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available[.]

Id. § 1677e(a)–(b).

[4] In the NME context, Commerce employs a rebuttable presumption of state control whereby a company is assigned the rate applicable to all entities controlled by the government, i.e. a country-wide rate.  <u>Sigma Corp. v. United States</u>, 117 F.3d 1401, 1405 (Fed. Cir. 1997).  Here, the country-wide rate is the PRC-wide rate.  According to Commerce's procedures, to receive a non-country-wide rate, a company must file a separate rate certification indicating that it is <u>de jure</u> and <u>de facto</u> independent of government control.  Id.

appealed, and the court upheld Commerce's decision to select total AFA for Golden Bird. FGPA, 121 F. Supp. 3d at 1320, 1327. The court, however, rejected Commerce's selection of the PRC-wide rate as Golden Bird's total AFA rate because Commerce had failed to make a finding that Golden Bird's separate rate certification was deficient or unreliable. Id. at 1328.

On remand, Commerce found, under protest, Golden Bird eligible for a separate rate. Remand Results at 14. Commerce reiterated its position that "the severity of Golden Bird's failure to cooperate and the centrality of the deficient response to the calculation of a dumping margin" sufficiently call into question the integrity of Golden Bird's information regarding its operation as a separate entity. Id. at 15 (quoting FGPA, 121 F. Supp. 3d at 1326). Commerce, however, refused to make a specific finding regarding the deficiency of Golden Bird's separate rate information because it reasoned that such a finding could be reached only by "follow[ing] the same logic that the Department applied [previously] and [which] the Court rejected." Id. at 16. Commerce ultimately assigned Golden Bird a total AFA rate of $2.24/kg. Id. at 6. That margin represents Xinboda's highest transaction-specific margin from the instant review. Commerce selected such a rate by reasoning that "Golden Bird should 'not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'" Id. (quoting Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199 ("SAA")).

Golden Bird does not object to the assignment of a total AFA rate based on Xinboda's highest transaction-specific margin from the POR. Cmts. on Commerce Dep't's Final Results of

Redetermination Pursuant to Remand 3, ECF No. 90 ("Golden Bird & QXF Cmts.").[5] The Fresh Garlic Producers Association, Christopher Ranch L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc. (collectively, "FGPA") do oppose Commerce's separate rate determination in the Remand Results. Pls.' Cmts. on Dep't's Redetermination Pursuant to Ct. Order 2, ECF No. 91 ("FGPA Cmts."). FGPA argues that Golden Bird's separate rate certification suffers from some of the same deficiencies as the sales information, namely that the same individual attests to the accuracy of both sets of documents. Id. at 2, attach. 1 at 2–3. Accordingly, FGPA reiterates its previous arguments supporting the assignment of the PRC-wide rate as Golden Bird's total AFA rate. Id. at 3, attach. 1 at 11–14.

In the Final Results, Commerce also selected the Philippines as the surrogate country for calculating FOPs. Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review: Fresh Garlic from the People's Republic of China; 2011–2012 Administrative Review at 5–10, A-570-831, (June 23, 2014), available at http://enforcement.trade.gov/frn/summary/prc/2014-15279-1.pdf (last visited June 30, 2016) ("I&D Memo"). On initial appeal, Jinan Farmlady Trading Co., Ltd., Qingdao Xintianfeng Foods Co., Ltd., Shenzhen Bainong Co., Ltd., Jining Yifa Garlic Produce Co., Ltd., Weifang Hongqiao International Logistics Co., Ltd., Yantai Jinyan Trading, Inc. (collectively, "QXF"),

---

[5] Golden Bird merely asks, based on the surrogate country issue, that if Xinboda's highest transaction-specific rate changes, Golden Bird's rate change accordingly. Golden Bird & QXF Cmts. at 3. In addition, Jinan Farmlady Trading Co., Ltd., Qingdao Xintianfeng Foods Co., Ltd., Shenzhen Bainong Co., Ltd., Jining Yifa Garlic Produce Co., Ltd., Weifang Hongqiao International Logistics Co., Ltd., Yantai Jinyan Trading, Inc. (collectively, "QXF") all submitted comments on the remand results in conjunction with Golden Bird. Accordingly, the court will refer to those comments as "Golden Bird & QXF Cmts." The court also notes that Shijiazhuang Goodman Trading Co., Ltd., indicated that it was withdrawing from the action and not was not submitting comments on the Remand Results. See generally Golden Bird & QXF Cmts.

and Xinboda challenged Commerce's choice of the Philippines as the surrogate country, arguing that the Philippines is not a significant producer of fresh garlic and that the Philippine data was not the best available information.  FGPA, 121 F. Supp. 3d at 1336.  In response, Commerce explained that the Philippines is a significant producer because the Philippines had a "noticeably or measurabl[y] large" amount of fresh garlic production during the POR.  See I&D Memo at 8 n.22.  Commerce deviated from its typical significant producer analysis where it takes into account "world production . . . and trade."  Policy Bulletin 04.1, Non–Market Economy Surrogate Country Selection Process (Mar. 1, 2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited June 30, 2016) ("Policy Bulletin 04.1")[6] ("[A] judgement [sic] should be made consistent with the characteristics of world production . . . and trade. . . ."); see Dupont Teijin Films v. United States, 997 F. Supp. 2d 1338, 1342 (CIT 2014) ("Commerce assesses the output of the potential surrogate country in relation to world production and trade in comparable merchandise."); Shandong Rongxin Imp. & Exp. Co. v. United States, 774 F. Supp. 2d 1307, 1316 (CIT 2011) (defining "significant" as "having or likely to have influence or effect"), aff'd sub nom., China First Pencil Co. v. United States, 466 F. App'x 881 (Fed. Cir. 2012).  Commerce explained that such deviation was warranted given world garlic market conditions and the dominance of the PRC's production.  FGPA, 121 F. Supp. 3d at 1339.  The court held that because there was no comparative aspect to Commerce's analysis, Commerce had

---

[6] This bulletin is a compilation of the International Trade Administration's guidelines for AD investigations and administrative reviews.  Though not binding authority, courts, including this one, view this bulletin as indicative of Commerce's best practices and Commerce's statutory interpretation for reviews of AD duty orders.  See, e.g., DuPont Teijin Films v. United States, 997 F. Supp. 2d 1338, 1342–45 (CIT 2014); Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States, 896 F. Supp. 2d 1313, 1320–23 (CIT 2013).

Consol. Court No. 14-00180                                                                                              Page 8

improperly determined that "any commercially meaningful production" was significant. Id.; see Policy Bulletin 04.1 (permitting "any commercially meaningful production" to be significant when, for example, only three countries produce the goods in question).

The court instructed Commerce "to reconsider its surrogate country selection." FGPA, 121 F. Supp. 3d at 1342. The court further held that because the selection of the Philippines was unsupported by substantial evidence, the court did not need to address specific challenges to the Philippine data, such as the use of net weights, adjustments to the import statistics, or whether the Philippines provided the best quality data. Id. at 1340. The court, however, suggested that should Commerce continue to rely on the Philippines, Commerce should "take a fresh look at its use of net weights and adjustments to import statistics and provide clear explanation for its decisions." Id. at 1342 n.21.

On remand, Commerce did not reconsider its surrogate country selection, but rather, attempted to further explain its original rationale. Commerce again noted that the dictionary definition of "significant" includes "a noticeably or measurably large amount." Remand Results at 9. Commerce then determined that "the production level of 9,056 [metric tons] of garlic was significant because that amount was 'noticeably or measurably large' enough to reasonably assume that the data reflect transactions among buyers and suppliers in a normal marketplace." Id. Once more, Commerce emphasized the "paucity of candidates to serve as surrogate market economy countries" to justify its conclusion that its typical definition of significant producer was inappropriate. Id. Although Commerce "disagree[d] with the court that there is an inherent 'comparative aspect of the significant producer analysis,'" Commerce tried to explain how a comparative analysis also supports the selection of the Philippines. Id. at 11 (quoting FGPA, 121

F. Supp. 3d at 1340). Excluding the PRC, of the ninety-five countries that produced fresh garlic in 2011, the Philippines ranked forty-third, meaning it was in the top half of all producers, and thus, according to Commerce, comparatively significant. Id.

In their comments on the Remand Results, Xinboda, QXF, and Golden Bird (collectively "Respondents") contest the use of the Philippines as the surrogate country on the grounds that it is not a significant producer, its data is not reliable, and Commerce incorrectly used the available data. Golden Bird & QXF Cmts. at 3–7; Consol. Pl. Shenzhen Xinboda Indus. Co., Ltd. Cmts. on U.S. Dep't of Commerce Remand Redetermination 2–19, ECF No. 92 ("Xinboda Cmts."). Xinboda contends that Commerce failed to comply with the court's order to further explain the selection of the Philippines, asserting that Commerce's "half-hearted comparative analysis makes no sense." Xinboda Cmts. at 12. Xinboda specifically argues that Commerce's comparative analysis overlooked the fact that, even after excluding India's and the PRC's production, the Philippines "still only produces 0.26 percent of the remaining garlic production."[7] Id. Moreover, Xinboda argues that by Commerce's own admission, Commerce assumed that Philippine data "reflect[ed] transactions . . . in a normal marketplace" and that several factors make the Philippines an abnormal market. Id. at 6–7 (quoting Remand Results at 9).[8] QXF specifically argues that the differences in the production levels of the Philippines and

---

[7] Xinboda, citing Ad Hoc Shrimp Trade Action Comm. v. United States, 882 F. Supp. 2d 1366 (CIT 2012), first repeats its argument that Commerce's sequential analysis (where it first examines economically comparability) is legally flawed. Xinboda Cmts. at 5–6. As noted in FGPA, Commerce's sequential approach was not impermissible as an initial approach. 121 F. Supp. 3d. at 1336.

[8] FGPA did not comment on Commerce's continued selection of the Philippines as the surrogate country. FGPA Cmts. at 3 n.2.

the PRC and resulting differences in economies of scale render any comparison between export price and normal value not a "fair comparison" in contravention of the statute. Golden Bird & QXF Cmts. at 4. Instead, QXF argues that by looking at per capita fresh garlic production it is apparent that the Philippines is not a significant producer.[9] Id. at 4–5.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). Commerce's final results in an administrative review of an AD duty order are upheld unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.  Golden Bird's Total AFA Rate

On remand, Commerce was not able to identify any "deficiencies in Golden Bird's [separate rate certification] or Section A responses specific to government control of its export activities[.]" Remand Results at 14–15. Accordingly, in compliance with the court's order and because Commerce was unable to point to any relevant record evidence related to government control, Commerce properly determined Golden Bird to be eligible for a separate rate. See id. at 14–17. FGPA contends that Commerce should have found Golden Bird's separate rate

---

[9] QXF also argues that Commerce failed to articulate "particular, specific and objective evidence" on the record to support excluding or adjusting certain parts of the Philippine import statistics. Golden Bird & QXF Cmts. at 6. (citing China Nat'l Mach. Imp. & Exp. Corp. v. United States, 27 CIT 255, 266–67, 264 F. Supp. 2d 1229, 1239–40 (2003), aff'd 104 F. App'x 183 (Fed. Cir. 2004)); see also Mem. in Supp. of Pls.' Mot. for J. on the Agency R. 10–12, ECF No. 32 (challenging generally the adjustments to Philippine data). Finally, Respondents also challenge Commerce's rationale for using gross values, but net (rather than gross) weights in calculating surrogate values. Golden Bird & QXF Cmts. at 6–7; Xinboda Cmts. at 15–19.

information deficient, essentially reiterating its prior position that Golden Bird should be assigned the PRC-wide rate. FGPA Cmts. at 3, attach. 1 at 7–11. As Commerce correctly notes, FGPA's line of reasoning "largely mirror[s]" Commerce's argument in the original I&D Memo, Def.'s Resp. to Cmts. Regarding Remand Redetermination 7, ECF No. 96 ("Gov't Resp."), which the court previously rejected, FGPA, 121 F. Supp. 3d at 1325–27, and declines to reconsider. The evidence on the record calls into question only sales information, and "Commerce cannot ignore a party's separate rate information solely because it selects AFA due to defects related to sales data." Id. at 1328.[10] Accordingly, Commerce's determination that Golden Bird is entitled to a separate rate is sustained.

Commerce assigned Golden Bird a separate rate of $2.24/kg, which is the highest rate of any Xinboda transaction during the POR. Remand Results at 6. Normally, when calculating a separate rate, "accuracy and fairness must be Commerce's primary objectives." Albermarle Corp. & Subsidiaries v. United States, Nos. 2015-1288, 2015-1289, 2015-1290, 2016 WL 1730359, at *6 (Fed. Cir. May 2, 2016). In selecting an AFA rate, however, "Commerce must balance the statutory objectives of finding an accurate margin and inducing compliance, rather than creating an overly punitive result." Timken Co. v. United States, 354 F.3d 1334, 1345 (Fed. Cir. 2004).

---

[10] Additionally this is not a case where Commerce made a determination that directly related to a party's responses about government control and the veracity of information related to separate rate eligibility, such as where it concerned that party's alleged corporate affiliations, see Ad Hoc Shrimp Action Committee v. United States, 802 F.3d 1339, 1355–57 (Fed. Cir. 2015) (affirming application of country-wide rate as an AFA rate where unreliable responses concerned a respondent's corporate affiliations), or where Commerce made a finding of fraud on the proceedings, see Chang Tieh Industry Co. v. United States, 17 CIT 1314, 1318, 840 F. Supp. 141, 146 (1993) (acknowledging that Commerce has authority to prevent fraud upon its proceedings).

Recently, the Federal Circuit affirmed Commerce's use of one mandatory respondent's highest transaction-specific margin from the relevant POR as a total AFA rate for another mandatory respondent. Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1345 (Fed. Cir. 2016) ("Nan Ya").[11] In the instant case, Commerce based Golden Bird's total AFA rate on Xinboda's highest-transaction rate, reasoning that "Golden Bird should 'not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'" Remand Results at 6 (quoting SAA, H.R. Doc. 103-316 Vol. 1 at 870, 1994 U.S.C.C.A.N. at 4199). Commerce also determined that the underlying sale was "non-aberrational." Id. None of the parties have challenged the rate as aberrational.[12] When compared to Xinboda's non-AFA rate, Golden

---

[11] The court notes that Nan Ya appears to question prior Federal Circuit precedent. As the opinion was not rendered en banc, however, the court presumes that Nan Ya is to be interpreted consistently with other Federal Circuit precedent, so that clearly aberrational rates are not to be sustained. Reasonable choices are required.

[12] The court has previously remanded at least one case where Commerce, relying on primary information, failed to demonstrate that a separate AFA rate was "a reasonably accurate estimate of the respondent's actual rate" and was not aberrational. Dongguan Sunrise Furniture Co. v. United States, 931 F. Supp. 2d 1346, 1352–54 (CIT 2013) (remanding where Commerce calculated a partial AFA rate for a mandatory respondent from the respondent's own POR data, but based the rate only on a small number of individual transactions "[w]ithout a rational explanation linking the chosen AFA rates to [the respondent's] actual rate"). In that case, however, Commerce selected only partial AFA. Thus, Dongguan was not "a total AFA case where the record [was] devoid of all [trustworthy] sales data" for the respondent. Dongguan Sunrise Furniture Co. v. United States, 865 F. Supp. 2d 1216, 1234 (CIT 2012)

Here, Golden Bird's previous two separate rates were $0.14/kg in the sixteenth administrative review and de minimis in the seventeenth review. Fresh Garlic from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg. 36,168, 36,169 (Dep't Commerce June 17, 2013) (seventeenth administrative review); Fresh Garlic from the People's Republic of China: Final Results of the 2009–2010 Administrative Review of the Antidumping Duty Order, 77 Fed. Reg. 34,346, 34,348 (Dep't Commerce June 11, 2012) (sixteenth administrative review). Xinboda's rate for this POR also significantly increased from de minimis in the prior review to $1.82/kg, which indicates that

(continued . . .)

Bird's assigned total AFA rate, which is only 23% greater, does not appear to be aberrational or unreasonable, especially given Commerce's deterrence objective. Thus, based on the record as it stands now Commerce's selection of Xinboda's highest transaction-specific, non-aberrational rate from the POR as Golden Bird's total AFA rate is permissible.[13]

## II. Surrogate Country Selection

On remand, Commerce has not revised its selection of the Philippines as the surrogate country for valuing the FOPs during the POR. Rather than conducting a meaningful comparative analysis to explain why the Philippines' seemingly meager production is significant, as the court instructed, Commerce simply stated in the Remand Results that the Philippines ranks forty-third out of the ninety-five countries which produced fresh garlic during the POR (excluding the PRC). Id. at 11. A mid-range rank in a list of countries with insignificant production does not make the Philippines a significant producer overall. Such "further explanation" is insufficient and the court once again holds that Commerce's selection of the Philippines is not supported by substantial evidence.

By statute, when selecting a surrogate country, Commerce "shall utilize, to the extent possible, the prices or costs of [FOPs] in one or more market economy countries that are . . . significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). As discussed in

---

market conditions and the change in surrogate country account for a substantial portion of the large increase from Golden Bird's recent past rates.

[13] The court assumes that, even if a new primary surrogate country is selected, Commerce will continue to use one or more of Xinboda's high margin transactions as the AFA margin for Golden Bird. If so, in assigning an AFA rate to Golden Bird and bearing in mind the statutory goals of deterrence and reasonable accuracy, Commerce should consider resulting changes to any such of Xinboda's high margin transactions, due to either the revised surrogate country selection or otherwise.

the court's prior opinion, "significant producer 'is not statutorily defined, and is inherently ambiguous.'" FGPA, 121 F. Supp. 3d at 1338 (quoting Shandong Rongxin, 774 F. Supp. 2d at 1316). Under Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1989), to determine whether Commerce's interpretation of the AD statute is entitled to deference the court conducts a two-part test. Where Congress has spoken directly to the question at issue, the court and Commerce must give effect to the unambiguously expressed intent of Congress. See id. If, however, the statute is vague or silent on an issue, as it is here, the court upholds Commerce's interpretation so long as the interpretation is reasonable. See id. at 843; DuPont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005). Because the statute is ambiguous as to significant producer, the court must determine whether Commerce's definition of significant producer is "based on a permissible construction of the statute." Shandong Rongxin, 774 F. Supp. 2d at 1316 (quoting Chevron, 467 U.S. at 843).

In its prior opinion, the court held that Commerce's definition for this case of "significant producer" as one whose production is "noticeably or measurably large" was not a permissible construction of the statute because it did not include a comparative aspect linking the volume to industry conditions. FGPA, 121 F. Supp. 3d at 1340. Commerce's interpretation thus did not comport with the statute's directive to derive reasonable FOPs from a market economy to use to determine hypothetical prices in the NME.[14] See Shandong Rongxin, 774 F. Supp. 2d at 1309

---

[14] The court previously determined that Commerce's deviation from its typical straightforward significant producer analysis, consisting of evaluating a potential surrogate country's production as a percentage of world production and trade was permissible based on the unique circumstances of the fresh garlic industry. Commerce, however, was required to devise some standard and support its selection of the Philippines or another country with substantial evidence and it has failed to do so.

Consol. Court No. 14-00180                                                                                         Page 15

("The purpose of [19 U.S.C. § 1677b(c)] is 'to assess the price or costs of [FOPs] of the subject merchandise in a surrogate market economy country, in an attempt to construct a hypothetical market value of that product in the [NME] country.'" (alterations omitted) (quoting Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999)).  On remand, Commerce's comparative analysis consisted of conclusory reasoning where Commerce explained that the Philippines was in the top half of world producers.  Such superficial analysis does not address the court's concern that using the Philippines, whose production is minimal, might create an unreasonable basis for FOPs in the PRC where there are undoubtedly significant economies of scale.  For example, if there were five producers of a good and the largest producer produced a hundred pounds of the good, the second largest produced ninety-seven, the third produced three, the fourth producer two, and the fifth produced one, it cannot reasonably be maintained that the third producer is "significant."  Commerce's "comparative analysis" thus adds nothing and does not aid the court in determining whether the Philippines is a significant producer.[15]  Determining that because the Philippines is in the top half of fresh garlic producers it is a significant producer is arbitrary and unreasonable.  Commerce has failed to comply with the court's instruction, and the court, once again, is forced to conclude that Commerce's determination is unsupported by substantial evidence.

---

[15] Conversely, the court notes that given the available data and lack thereof, it could be reasonable for Commerce to look at the mean of fresh garlic production among the non-PRC producers, which would be approximately 529,000 metric tons. See Golden Bird's Submission of Surrogate Country Selection Cmts. and Surrogate Value Info. at Ex. 1, PD 110–15 (June 26, 2013).  India's production exceeds that mean. See id.  Excluding both the PRC's and India's production results in a mean of approximately 148,000 metric tons and yields eight additional countries producing more than the resulting mean. See id.

Next, Commerce's conclusion that the Philippine production was significant irrespective of any comparative analysis is unsupported. Simply because nine million metric tons is a large number in the abstract, does not mean that such level of production is significant. Also, whether such level of production can be assumed to create reliable market-based transaction information again depends on the industry and, as described below, given the small production in the Philippines, such an assumption is unsupported by substantial evidence. Further, the court is unpersuaded by Commerce's rationale that the "paucity of candidates" make its selection of the Philippines supported by substantial evidence. Commerce created the situation where there were a paucity of candidates by limiting the number of economically comparable countries on the surrogate country list.[16] It cannot now cite that paucity as a reason requiring a flexible interpretation of significant producer to essentially render that criterion meaningless.

Moreover, this is not a situation where there are no significant producers besides the NME. India produces nearly 5% of the world's fresh garlic and excluding fresh garlic produced in the PRC, India represents 23.5% of the market. See Golden Bird's Submission of Surrogate Country Selection Cmts. and Surrogate Value Info. at Ex. 1, PD 110–15 (June 26, 2013)

---

[16] Additionally, in at least one prior case, the court has sustained a determination by Commerce selecting a surrogate country that was not on the original surrogate country list of economically comparable countries. See An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States, Slip Op. 16-55, 2016 WL 3369235, at *8 (CIT June 7, 2016). In that case, Commerce explained that the surrogate country list is simply a list of countries at the same level of economic development as the NME in question, but that it is not exhaustive and there may be other countries which are also economically comparable to the NME. See id. at *3, *5. In sustaining Commerce's determination, the court stated, "[w]hile Commerce acknowledged that Indonesia is less economically comparable to Vietnam as compared to the countries on the [surrogate country list], Commerce reasonably concluded that data considerations . . . outweigh the fact that Indonesia is not at the same level of economic development as Vietnam." Id. at *8 (internal quotation marks omitted). Commerce has not explained why significant producer considerations may not similarly outweigh differences in economic comparability.

Consol. Court No. 14-00180                                                                                    Page 17

("Golden Bird's SV Info."). Additionally, there are four counties who produce at least 5% of the fresh garlic production when the PRC's production is excluded. See id. Thus, contrary to the government's argument, the production excluding the PRC is not evenly divided. The Philippines, which represents only 0.2% of production excluding the PRC's production, is a small producer, and Commerce has said nothing which could somehow render such data suitable for a fair comparison between export price and normal value. Further, when the PRC is excluded, the remaining top nine producers each represent almost 4% of the market and together make up more than 63% of the market. Policy Bulletin 4.01 indicates that where there are ten large producers and a variety of small producers, "'significant producer' could be interpreted to mean one of the top ten." Thus, Commerce has not established that this is a case requiring the selection of a surrogate country which is not a significant producer because there are other potential surrogate countries which are significant producers.

In ordinary cases, Commerce's multi-part surrogate selection process should result in a usable surrogate country. When, as here, however, the countries on the economically comparable list may not be significant producers and the significant producers are not on the economically comparable country list, Commerce must utilize a reasonable methodology to select a surrogate country or countries. Cf. An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States, Slip Op. 16-55, 2016 WL 3369235, at *8 (CIT June 7, 2016); see also Policy Bulletin 04.1. Commerce has a duty to act reasonably and should bear in mind the purpose of the surrogate country section of the statute, namely to identify reliable market-based prices upon which to value an NME producer's FOPs to conduct a fair comparison between normal value and export price. See 19 U.S.C. § 1677b(a) ("In determining under this subtitle whether subject

Consol. Court No. 14-00180                                                                                           Page 18

merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value."); <u>Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States</u>, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("In determining the valuation of the [FOP], the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible."). Commerce's methodology here, determining that any producer with a measurable amount of production that is above the median of world producers, is not reasonable and provides no assurance that reasonably accurate margins will result.

It may be that the only significant producer is not "economically comparable," as defined by Commerce, however, Commerce must construct a reasonable method of selecting a surrogate country when the significant producers are not closely economically comparable and the chosen economically comparable countries may not be significant producers. It has not done so in this review. Simply because it is difficult, or may require adjusting surrogate values, or using multiple surrogate countries does not mean that Commerce may select a surrogate country which is not a significant producer. Commerce is to meaningfully evaluate the statutory directive and come up with a method that addresses the statute's goals while balancing the statutory factors to use the best available information. Commerce's half-hearted attempt to comply with the court's order requiring a comparative aspect to the significant producer analysis does not persuade the court that substantial evidence supports Commerce's determination. Commerce has not explained why the gains achieved in selecting a more economically comparable surrogate country are infinitely greater than the loss of not selecting a truly significant producer of subject

merchandise.  The court is persuaded by the reasoning in Ad Hoc Shrimp Trade Action Committee v. United States, 882 F. Supp. 2d 1366, 1374 (CIT 2012) ("Ad Hoc Shrimp I"), where it stated that "none of the three surrogate country eligibility criteria—economic comparability, significant production of comparable merchandise, and quality data—is preeminent."[17]  Here, Commerce has arbitrarily discounted the value of significant production.  See id.  It has created a broad test for significant producer and apparently a narrow test for economic comparability.  Accordingly, the court remands this matter to Commerce to address surrogate country selection.[18]

## CONCLUSION

For the foregoing reasons Commerce's Remand Results are sustained in part and remanded in part for Commerce to reconsider its surrogate country selection.  Commerce shall have until September 6, 2016, to file its remand results.  The parties shall have until October 6,

---

[17] Indeed, the statute's directive to use the best available information requires remand.  See 19 U.S.C. § 1677b(c)(1); see also Vinh Hoan Corp. v. United States, 49 F. Supp. 3d 1285, 1302–06 (CIT 2015) (holding that based on its duty to use the best available information in selecting a surrogate country or countries, Commerce is required to compare the relative economic comparability of potential surrogate countries where data quality does not clearly support one surrogate country's selection over another and stating "the ultimate question is what is the best available information to value the respondents' factors of production?  Thus, Commerce must choose the country that furthers this goal.  The analysis suggested by [Ad Hoc Shrimp I], and adopted here, is that Commerce must compare differences in economic comparability with differences in the other factors, including data quality, when the facts so require").

[18] There is no need to address specific surrogate value issues as there likely will be a new principal surrogate country selected on remand.  In using whatever surrogate data it chooses, Commerce must support adjustments to import statistics with contemporaneous "particular, specific, and objective evidence" and in the face of challenges to reliability provide clear explanations for its decisions.  Such explanations largely were lacking in the previous determinations.

Consol. Court No. 14-00180 Page 20

2016, to file objections, and the government shall have until October 20, 2016, to file its response.

Dated: July 7, 2016  /s/ Jane A. Restani
       New York, New York  Jane A. Restani
                                   Judge